UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
JOSEPH MWANTUALI,

                              Plaintiff,

              -against-

HAMILTON COLLEGE,

                           Defendant.
-----------------------------------------------------------------------X

Civil Action No.  6:22-cv-1395 (MAD/ML)


**COMPLAINT**

**JURY TRIAL DEMAND**

Plaintiff JOSEPH MWANTUALI ("Plaintiff" or "Mr. Mwantuali"), hereby alleges through his counsel, Tully Rinckey, PLLC, as against Defendant HAMILTON COLLEGE ("Defendant,"), as follows:

## PRELIMINARY STATEMENT

1.      Defendant Hamilton College has engaged in a continuous pattern and practice of racial discrimination for more than twenty years. Plaintiff is a black male professor in Defendant's French and Francophone Studies Department ("FFS Department"), who has been denied equal treatment at every turn.

2.      *First,* Defendant failed to promote Mr. Mwantuali to the role of Professor under the same terms and conditions as those of his white counterparts. *Second,* Defendant failed to promote Mr. Mwantuali to the role of Chair of the FFS Department under the same terms and conditions as those of his white counterparts.  *Third,* Defendant maintained and sanctioned internal policies which made its racial bias systemic and continuous. *Fourth,* Defendant consistently ignored Mr. Mwantuali's complaints about racial discrimination, and failed to engage in any remedial action. *Fifth,* Defendant applied its rules in an arbitrary manner whereby Mr. Mwantuali's complaints about human rights violations were summarily dismissed, whereas the false and trivial complaints

of other white professors against Mr. Mwantuali were given the highest level of attention and scrutiny, resulting in severe penalties to Mr. Mwantuali.

3.      Significantly, several professors from other departments and universities noted the systemic racism in the FFS Department. Notably, in connection with Plaintiff's within EEOC filing, Professor Haley of the Classics Department made the following statement in support of Plaintiff's application:

> I am Shelley P. Haley and I have been a professor of Classics and Africana Studies at Hamilton College, since July 1, 1989. I recently retired from that position, effective June 30, 2021. I have known Joseph since he joined the faculty in 1995; he soon became a family friend and I saw firsthand the pattern of workplace bullying, discrimination and harassment he suffered at the hands of his department members (especially the white women) from the start as well as the toll this has taken on his physical and mental health.
>
> […]
>
> You have in your possession from Joseph the evidence of discrimination, harassment and the component microaggressions that created and still maintains a toxic and hostile work environment. All of these were racial in nature: Joseph, a Black man, an immigrant from the Democratic Republic of the Congo, was targeted by a cabal of white women from the United States and France. […] The sanctions imposed on Joseph was an academic work environment lynching.

(Exhibit B, EEOC Rebuttal).

4.      Mr. Mwantuali now brings this action pursuant to 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), and New York Executive Law § 296, to seek redress for over twenty-five (25) years of continues discrimination. He is seeking, inter alia, monetary relief (including past and ongoing economic loss), compensatory and punitive damages, disbursements, costs, and fees.

## JURISDICTION AND VENUE

5.      The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §

1331 as this action involves federal questions regarding the deprivation of Plaintiff's rights under federal law. This Court has supplemental subject matter jurisdiction over Plaintiff's related state and local law pursuant to 28 U.S.C. § 1367(a).

6.      Venue in the Northern District of New York is proper under 28 U.S.C. § 1391 because this is the place where the unlawful employment practices occurred.

## ADMINISTRATIVE PROCEDURES

7.      On January 13, 2021, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), among other claims.

8.      On September 29, 2022, the EEOC issued a Notice of Right to Sue, setting forth his rights to bring this claim under federal law. (See Exhibit A).

9.      Plaintiff has complied with any and all other prerequisites to filing this action.

## JURY DEMAND

10.      Plaintiff demands a trial by jury on all claims so triable.

## PARTIES

11.      At all times relevant herein, Plaintiff Joseph Mwantuali was and remains a natural person and currently resides in the County of Oneida, State of New York.

12.      At all times relevant herein, Plaintiff was an "employee" of Defendant within the meaning of 42 U.S.C. §§ 2000e, *et seq.*, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, and the Human Rights Law of the State of New York.

13.      At all times relevant herein, Defendant Hamilton College maintained its principal place of business at 198 College Hill Road, Clinton, New York.

14.      Defendant is an education corporation organized and existing under the laws of the

State of New York.

15.     At all relevant times herein, the Defendant employed more than fifteen (15) persons.

16.     At all times relevant herein, Defendant was an "employer" within the meaning of 42 U.S.C. §§ 2000e, *et seq.*, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, and the Human Rights Law of the State of New York.

## FACTUAL ALLEGATIONS

17.     Plaintiff identifies as a black male.

18.     Plaintiff's country of origin is the Democratic Republic of the Congo (Central Africa).

19.     Plaintiff was hired by Defendant in 1995 as an Assistant Professor in Defendant's French and Francophone Studies Department ("FFS Department").

20.     Plaintiff secured his tenure with Defendant in 1999.

21.     Plaintiff became a full Professor in 2012, after having to confront and overcome many departmental obstacles, in contrast to his white counterparts, as detailed below.

***Plaintiff Is and Was the Only Black Professor in His Department, and all Leadership Roles Were Held by Non-Black Faculty Members***

22.     From 1995 to the present, Plaintiff has been the only black faculty member within the FFS Department.

23.     At all times relevant herein, Plaintiff's colleagues in the FFS Department consisted of white/Caucasian employees.

24.     From 2004 through 2012, apart from Plaintiff, the FFS Department consisted of

four (4) faculty members: three (3) females[1] and one (1) male.[2]  These four (4) faculty members are all white/Caucasian.

25.     From 2012 to the present, there have been adjuncts/visiting professors, notably Yen Vu and Katarzyna (Kasia) Stempniak (2019 – 2020), who are both white/Caucasian.  They were supportive of Plaintiff, in contrast to other members of the faculty.

26.     At all times relevant herein, Plaintiff and his colleagues within the FFS Department performed shared equal responsibilities and were expected to perform work requiring equal skill and effort. However, Plaintiff was consistently treated in an inferior manner, as detailed herein.

27.     At all relevant times, Defendant's administration consisted of all white and/or Caucasian employees.

28.     From 2006 through June 2010, Defendant's Dean of Faculty was Joseph Urgo ("Dean Urgo").

29.     Dean Urgo is and was a white/Caucasian male.

30.     From July 2011 through 2015, Defendant's Dean of Faculty was Patrick Reynolds ("Dean Reynolds").

31.     Dean Reynolds is and was a white/Caucasian male.

32.     From 2015 through 2017, Defendant's Dean of Faculty was Margaret Gentry ("Dean Gentry").

33.     Dean Gentry is and was a white/Caucasian female.

34.     From 2017 to the July 2022, Defendant's Dean of Faculty was Susanne Keen ("Dean Keen").

35.     Dean Keen is and was a white/Caucasian Female.

---

[1] Professors Bonnie Krueger, Martine Guyot-Bender and Cheryl Morgan.
[2] Professor John O'Neal.

36.     Importantly, on or about 2016, a group of outside professors conducted a review of the FFS Department due to complaints about lack of diversity (hereinafter the ""2016 Department Review"). The reviewing professors were Professor Scott Carpenter of Carleton College, Professor Lynn Higgins of Dartmouth College, and Professor Kirk Read of Bates College. (See Exhibit C). As part of its review, the professors observed that: "Not all members of the department feel they have a full voice, which sometimes leads to disengagement on important Departmental matters." (Id. at 6).  Thus, 2016 Department Review specifically recommended several remedial actions, including: i) the dean should consult with an "extra-departmental mentor/colleague" who would be present at all department meeting;; ii) the Dean should "appoint one or two outside members to the search committee who will be present at all deliberations"; and iii) the Department should "develop clear rules of decision-making – especially for situations where consensus cannot be reached."  (Id. at 7).

37.     Significantly, Dean Gentry, who was Dean at the time, disregarded the aforementioned recommendations and maintained the status quo.

38.     Dean Gentry's refusal to engage in remedial action, after receiving explicit recommendations from three (3) outside professors, was an explicit sanctioning of the existing racism in the department.

***Defendant Instituted and Maintained Discriminatory Practices That Initially Excluded Plaintiff from the Role of Professor***

39.     Defendant's faculty ranks are as follows: Research Associate; Lecturer; Senior Lecturer; Assistant Professor of Instruction, Associate Professor of Instruction; Professor of Instruction; Instructor; Assistant Professor; Associate Professor; Professor.

40.     It was Defendant's customary practice to consider recommendations from department faculty and the Committee on Appointments ("COA") with respect to applications for

the rank of Professor. However, this policy was discriminatory to Plaintiff because none of his colleagues could support his nomination for the rank of Professor.

41.      Plaintiff was eligible for the rank of Professor in or around 2004.

42.      Plaintiff was eminently qualified for the rank of Professor in or around 2004.

43.      Thus, beginning in or around 2004, Plaintiff sought support from his colleagues to be nominated for the rank of Professor.

44.      However, upon information and belief, from 2004 through 2012, Plaintiff's three (3) white/Caucasian female colleagues – Professors Bonnie Krueger, Martine Guyot-Bender and Cheryl Morgan – deliberately vetoed and/or prevented Plaintiff's nomination to be promoted to the Professor rank.

45.      In or around 2012, Plaintiff directly requested that Professor Roberta Krueger ("Professor Krueger") support his nomination to be promoted to the Professor rank.

46.      Professor Krueger declined to support Plaintiff's nomination and cited the pretextual need for Plaintiff to produce book contracts.

47.      This "excuse" was patently false, as by 2012, Plaintiff had produced two (2) signed book contracts: *Le Discours africain à l'ère des exorcistes* had a contract signed with Les Éditions Panafrika/Silex/Nouvelles du Sud; and *L'Enseignement d'une Éveilleuse d'Étoiles* had a contract signed with Nouvelles Éditions Africaines/Abidjan (NEA).

48.      Plaintiff complained to Dean Patrick Reynold that he was not receiving any nomination despite having all necessary qualification. The Dean ignored Plaintiff's complaints and failed to engage in any remedial action.

49.      In or around October 2012, having no alternative, Plaintiff resorted to "self-nominate" himself for the rank of Professor.

50.     Plaintiff was notified in or around August 2012 that he achieved full Professor rank. (See Exhibit D). In confirming the nomination, Dean Reynolds noted that, "students praise and are inspired by your enthusiasm, energy, and patience. You are also noted for your ability to create an environment in which students are at ease."  (Id.) Dean Reynolds also summarized remarks about Plaintiff's manuscripts:

> One outside evaluator considers you to be held in high esteem in the field, that you are doing "crucial research on African cinema," and that your articles are "an exciting intellectual experience" to read and have "repositioned the field" of post-colonial theory. The COA echoes this reading of the external evaluators, and further states that your "growing international reputation rest as much on the impact of his creative work as on his scholarship. The invitation from Chinua Achebe to participate in the November 2010 International Colloquium on Africa and the October 2011 honors at the University of South Africa are undoubtedly due in part to Joseph's rising profile as an emerging African novelist." (Id.).

51.     This August 2012 nomination confirms that Plaintiff's qualifications were never doubted. Thus, the failure to nominate him was based solely on his race and national origin.

52.     The FSS Department's implicit racism is evidenced by the fact that Professor Kreuger subsequently supported the application of Cheryl Morgan ("Professor Morgan") to be promoted for the Professor rank and requested that Plaintiff support Professor Morgan.

53.     Importantly, Professor Morgan was *less qualified* than Plaintiff when he sought the role of Professor, as she had not been published at all. However, Professor Krueger and the FFS Department faculty supported Professor Morgan's nomination, one year later, for the Professor rank despite her having no publishing contracts.

54.     Professor Krueger and the FFS Department faculty discriminated against Plaintiff based upon his national origin and/or race in deliberately preventing Plaintiff's nomination for the Professor rank for eight years (from 2004 through 2012), while allowing Plaintiff's white/Caucasian counterparts to achieve the rank of professor with less conditions and

requirements, and with the support of the Department.

55.     The long delay in achieving the rank of Professor caused Plaintiff significant damages. It also caused significant reputational harm that has impacted his career trajectory until today. Moreover, this long delay and unnecessary bias caused Plaintiff significant mental anguish, and emotional pain and distress as this delay was premised wholly on racial animus.

56.     To try and achieve an equal playing field, in or around November 2014, Plaintiff submitted an internal complaint to the FFS Department regarding Professor Krueger's role in denying him the nomination, and instead nominating a less qualified white applicant. Thereafter, Professor Morgan advised that she "hated" Plaintiff, or words to that effect.

57.     As expected, the FFS Department did not engage in any remedial action. Worse still, Plaintiff experienced further retaliation, as detailed below.

***Defendant Instituted and Maintained Discriminatory Practices That Initially Excluded Plaintiff from the Role of Chair of Department***

58.     Upon information and belief, the FFS Department Chair is appointed by the Dean based upon advice solicited from all department members.

59.     Upon information and belief, a Chair's appointment term is for one (1) academic year and limited to no more than three (3) appointment terms.

60.     The requirements for the position of Chair are tenure, and at least the rank of Associate Professor.

61.     Thus, Plaintiff had been eligible to be nominated as the FFS Department Chair since 1999. However, Plaintiff was never given his turn to be Chair, while everyone in the department had been Chair at lease twice.

62.     Significantly, as of June 2016, Plaintiff was the only FFS Department faculty member who had not been nominated and/or served as the FFS Department Chair. This disparity

was striking, and should have immediately been a matter of concern to the Department, particularly in light of Plaintiff's complaints about the institutional racism. Moreover, the March 2016 Department Review should have put the Department on notice that its internal policies were woefully lacking. (Exhibit C).

63.     In or around June 2016, Dean Gentry e-mailed FFS Department faculty members and requested nominations for a FFS Department Chair because Professor Morgan's term as the FFS Department Chair was ending.

64.     In response to this e-mail, Plaintiff stated that: 1) he was the only FFS Department faculty member who had never been nominated as a Chair; 2) he should be considered as a nominee to the FFS Department Chair; and 3) it was clear that his colleagues did not support and would not nominate Plaintiff to become the FFS Department Chair.

65.     Nonetheless, Dean Gentry appointed Professor Morgan to serve a second term as the FFS Department Chair through the 2017 academic year.

66.     Subsequently, Plaintiff wrote to Dean Gentry and complained of discrimination, noting that he had been at the Professor rank longer than Professor Morgan, had seniority over her, and that he was therefore more qualified than her to hold this role.

67.     In response, Dean Gentry noted that Professors Krueger, Guyot-Bender and Morgan, all opposed Plaintiff's FFS Department Chair appointment. Shockingly, the Department sanctioned this opposition, despite explicit recommendations from the March 2016 Department Review that the Department use "an extra-departmental colleague/mentor" and "appoint one or two outside members to the search committee." (Exhibit C at 7).

68.     By and through their policies and practices, Dean Gentry and FFS Department faculty deliberately prevented Plaintiff's appointment as the FFS Department Chair due to his race

and/or national origin.

69.     Further, Dean Gentry and FFS Department faculty deliberately prevented Plaintiff's appointment as the FFS Department Chair in retaliation for Plaintiff's opposition to Defendant's discriminatory practices.

70.     On or about October/November 2016, Plaintiff complained to Phyllis Breband ("Ms. Breband"), Defendant's Interim Director of Diversity and Inclusion, regarding Defendant's discriminatory practices that had prevented him from being appointed as the FFS Department Chair. In response, Ms. Breband sought the intervention of David Wippman, Defendant's President.

71.     Subsequently, Plaintiff was asked to wait so that Cheryl Morgan could serve one more year. Thereafter, thanks to Ms. Breband's effort, Plaintiff became Chair in 2018.

72.     This long and undeserved delay in achieving the rank of Chair caused Plaintiff significant reputational harm that has impacted his career trajectory until today. Moreover, this long delay caused Plaintiff significant mental anguish, and emotional pain and distress, as it was premised wholly on racial animus.

73.     Other discriminatory acts against Plaintiff consisted of, inter alia: i) Professors Guyot-Bender, Moufllard, and Morgan organizing meetings on weekends at one of their respective homes, excluding Mwantuali; and ii) choosing Teaching Assistants without Plaintiff's input, even when he was the Department Chair.

74.     Ultimately, Plaintiff stepped down from the role of Chair, as the increased hostility and discrimination became intolerable.

***Plaintiff Makes Complaints About Bullying, Intimidation, and Harassment, But All His Complaints Are Ignored***

75.     As early as July 2009, Plaintiff wrote a letter to Dean Urgo complaining of

Professor Guyot-Bender's bullying, intimidation, threats, and harassment.

76.     Defendant did not investigate, respond or otherwise take appropriate and/or corrective action to Plaintiff's July 2009 complaint of Professor Guyot-Bender's bullying, intimidation, threats and harassment. Thus, Professor Guyot-Bender saw that her conduct was effectively endorsed by the Department.

77.     Further, as detailed above, on or above November 2014, Plaintiff made a complaint of discrimination in connection with Plaintiff's delayed promotion to the rank of Professor.

78.     Defendant deliberately disregarded and/or dismissed Plaintiff's November 2014 complaint of discrimination.

79.     Additionally, on or above November 2016, Plaintiff made a complaint of discrimination against Roberta Krueger in connection with her choice of nominating Cheryl Morgan to the rank of Professor, although Morgan was a *less* qualified candidate, in lieu of Plaintiff, who was the more qualified candidate. Upon information and belief, Defendant did not take appropriate and/or corrective action to Plaintiff's 2016 complaint of discrimination against Roberta Krueger. To the contrary, Professor Krueger was asked to be a member of COA (Committee of Appointment), which was the very committee that had consistently engaged in discriminatory conduct toward Plaintiff.

80.     Plaintiff made additional complaints about discrimination in connection with how the Department handled Professor Mouflard's complaint against him, and then handled his complaint against Professor Guyot-Bender. Moreover, at least two professors from outside departments in Hamilton College – Professor Shelley from the Classics Department and Professor Kantrowitz of the Mathematics Department – made statements about the FFS' Department biased handling of these two complaints, as detailed below.

81.     Importantly, Defendant ostensibly has as an "Affirmative Action Policy" which it readily produced in connection with the underlying EEOC action. (Exhibit E). However, this policy was *never* implemented during Plaintiff's entire tenure with the Defendant. Defendant *never* followed any of the steps for investigating Plaintiff's complaints, set forth therein.

***The FFS Department Respond to Professor Mouflard's Complaint In A Manner Wholly Inconsistent with How It Responded to Plaintiff's Numerous Complaints***

82.     In or around May 2019, Professor Mouflard filed a formal complaint against Plaintiff falsely alleging harassment and intimidation.

83.     In response, Defendant assigned two (2) investigators to investigate Professor Mouflard's allegations.

84.      Due to these false allegations, Plaintiff was subjected to a year-long investigation into his conduct. Additionally, Plaintiff was forced to prematurely step down as the FFS Department Chair in June 2019, because he could no longer tolerate the hostile and/or discriminatory treatment.

85.     On or about March 20, 2020, Dean Keen issued a decision *against* Plaintiff, which reeks of bias and inequality, as confirmed by Professors Haley and Kantrowitz. (Exs. B, F and G). Worse still, on or around March 2020, Dean Keen gave Plaintiff a severe penalty for the non-existent "discrimination" of Professor Mouflard.  She removed Plaintiff's evaluator/supervisory duties, barred Plaintiff from serving in a position of authority over Professor Mouflard, and relocated Plaintiff's office, causing him to be isolated from his colleagues. Plaintiff still remains in an isolated office, apart from his faculty members to this day.

86.     One of the supervisors and decision-makers in the Professor Mouflard complaint

was Professor Onno Oerlemans ("Professor Oerleman").[3] This selection was premised on bias and guaranteed that the investigation would be unjust.

87.     Indeed, by way of background, Dean Keen had appointed Professor Oerleman as Associate Dean and later as Department Chair in replacement of Plaintiff, on or about 2019.

88.     Since then, from June 2019 and continuing to the present, Professor Oerleman has engaged in discriminatory treatment and hostile work environment harassment in his role as the FSS Department Chair by isolating Plaintiff from his white/Caucasian colleagues and excluding him from important department meetings.

89.     Both as an Associate Dean and as the Chair of the French and Francophone Studies, Professor Oerleman was clearly biased against Plaintiff. Accordingly, Plaintiff had previously asked Dean Keen that she not appoint Professor Oerleman as a supervisor in the Claire Mouflard case because of his proven bias. However, Dean Keen dismissed this request, saying, "it is a small place where everyone knows everyone." Thus, the investigation was utterly impartial from the start.

90.     Recently, on October 17, 2022, Professor Robert Kantrowitz of the Defendant's Mathematics Department, submitted a letter, detailing his own impression of the Department's handling of Professor Mouflard's complaint against Plaintiff.

> Delving into the background surrounding the case that was brought against Joseph afforded me a view of the extraordinarily toxic environment in which Joseph had been toiling to these many years, It is clear to me that his colleagues – all white females – treated him very poorly, both professionally and personally. I was disappointing, dismayed, and disheartened over the cliquish, exclusive and unprofessional conduct to which Joseph was regularly subjected by the other members of his department for so long.
>
> […]

---

[3] Upon information and belief, Professor Oerlemans is White and/or Caucasian male and friends with Professors Guyot-Bender and Professor Morgan.

At best, the Dean made the wrong decision in this case. But my impressions is that it was far worse than that: *the entire scenario reeks of explicit racism resulting in the punishment of a Black African man for perceived slights by a white woman.* The complainant's exaggerations were amplified and bought wholesale by the white female Dean.

(<u>See</u> Exhibit F) (emphasis in original).

***Plaintiff Brings a Complaint Professor Guyot-Bender, But He is Denied Equal Process and Procedure Until The Department's Rules and Practices.***

91.     From 1997 to the present, Professor Guyot-Bender has taunted Plaintiff with attempts to engage in confrontations ("Let's fight"); made racially stereotypical remarks; invaded his and his family's privacy by showing-up unsolicited to Plaintiff's residence; spread rumors about Plaintiff's son and his disability; and threatened to "isolate" Plaintiff.

92.     From 2008 to the present, Plaintiff has reported Professor Guyot-Bender's discriminatory and harassing conduct to Defendant's administration on numerous occasions. However, no remedial, corrective and/or punitive action(s) have been taken by Defendant in response.

93.     In or around April 2020, Plaintiff was forced to file an internal complaint against Professor Guyot-Bender pursuant to Defendant's Sexual Misconduct Policy, alleging discrimination and harassment based on sex and race.

94.     The handling of Plaintiff's complaints of discrimination was treated differently than the complaints of Professor Mouflard. Notably, Plaintiff was afforded less time in responding to investigative questions and his request for an extension was denied. Conversely, Professor Guyot-Bender received all documents and/or information provided by Plaintiff in relation to his complaint against her. Moreover, Professor Guyot-Bender was accommodated with more time to respond to investigative questions and was not denied an extension.

95.     The disparity in how the Department handled Plaintiff's complaint versus how it

handled Professor Mouflard's complaint, caused Professor Shelley P. Haley ("Professor Haley"), the Chair of the Department of Classics to write an urgent email to the investigator on August 20, 2020. She wrote as follows:

> Dear Catherine and Ian,
>
> I am writing to ask that the following statement be included in the records for Joseph Mwantuali's case against Martine Guyot-Bender.
>
> As Joseph Mwantuali's advisor in his case against Martine Guyot-Bender, I am under an effective gag order. I am not allowed to ask questions or present testimony. But I can no longer be silent about the implicit bias and systemic racism I perceive in the procedures, regulations, tone and actions of Hamilton's HSMB.

(See Exhibit G). In this email, Professor Haley listed the various procedural inequalities between the two investigations and then concluded that "I believe the process should be scrapped and renewed with a whole new cast of players…" (Id.)

96.     Subsequently, in connection with Plaintiff's within claims before the EEOC, Professor Shelley included a rebuttal, and again highlighted the gross inequalities Plaintiff faced in connection with his complaint against Martine Guyot-Bender. She wrote as follows:

> I served as Joseph's faculty advisor in his charge against Martine Guyot-Bender in 2020-21 and the procedural irregularities and the inconsistent application of the Harassment policies and procedures were so egregious that I urged Joseph to drop this internal administrative process and go outside the institution for redress.
>
> […]
>
> I advised and encouraged him to drop the suit against Guyot-Bender, NOT because his case was weak (as the College contends), but because the whole procedure was so fatally flawed that he was doomed to fail.

(Exhibit B, EEOC Rebuttal).

97.     Indeed, in or around late 2020, Plaintiff withdrew his complaint against Professor Guyot-Bender due to the biased and discriminatory handling of the investigation conducted in

response.

98.    Defendant has deliberately, negligently, and with reckless disregard, subjected Plaintiff to extreme and baseless allegations, scrutiny and criticism of his performance and abilities. Similar actions were not taken toward white, Caucasian, and/or non-minority faculty. Defendant additionally has subjected Plaintiff to a hostile work environment based on race which continues to date.

## COUNT ONE

**(Discrimination based upon Race and National Origin Under Title VII, 42 U.S.C. § 2000e)**

99.    Plaintiff repeats and realleges the previous allegations as if fully stated herein.

100.    Defendant discriminated against Plaintiff based on his race and national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, as amended.

101.    Title VII prohibits covered employers from discriminating against any individual "with respect to his compensation, terms, conditions, or privileges of employment" because of, among other considerations, an individual's race.

102.    At all times relevant herein, Plaintiff was a member of protected classes under Title VII as a black male who originated from the Democratic Republic of the Congo.

103.    As alleged herein, Plaintiff suffered adverse employment actions and was subjected to disparate treatment giving rise to an inference of discrimination based on his protected classes in the form of threats, harassment, intimidation, discipline, and impediments to career progression taken and/or caused by Defendant, its agents and employees, including, but not limited to Dean Gentry, Dean Keen, Dean Reynolds, Dean Urgo, Professor Mouflard and Professor Guyot-Bender.

104.    Specifically, Defendant's discriminatory acts include, underlined inter alia: i) Instituting and maintaining policies that prevented Plaintiff from obtaining the role of Associate Professor and

Professor under the same conditions and terms as that of his white counterparts; ii) instituting and maintaining policies that prevented Plaintiff from obtaining the role of Department Chair under the same conditions and terms as that of his white counterparts; iii) applying its rules in an arbitrary manner whereby white faculty members receive no discipline for human rights violations but Plaintiff's conduct is reviewed with the highest level of scrutiny; and iv) applying its rules in an unequal manner whereby it investigated the complaints of white faculty members but dismissed and disregarded complaints by Plaintiff.

105.    Plaintiff has been disparately impacted by Defendant's internal policies, practices, and procedures, which have been discriminatory in operation, and have caused Plaintiff to be deprived of equal employment opportunities, career growth and otherwise adversely affected his status as an employee because of Plaintiff's race and/or national origin.

106.    Moreover, Defendant has fostered and subjected Plaintiff to a hostile work environment by failing and/or refusing to provide a safe environment and to employ procedures to prevent and deal with the discriminatory treatment, and abusive threats, harassment, and intimidation by its employees, including, but not limited to Dean Gentry, Dean Keen, Dean Reynolds, Dean Urgo, Professor Oerleman, Professor Mouflard and Professor Guyot-Bender.

107.    As a proximate result of Defendant's unlawful conduct, intentional, negligent, and reckless behavior, and violations of Federal and New York State laws, Plaintiff has suffered substantial past and future economic damages; compensatory damages, including, but not limited to fear, personal humiliation and degradation; pain and suffering; mental and emotional distress; and other incidental damages and expenses.

108.    Defendant's conduct was outrageous, malicious, and in reckless or intentional disregard of Plaintiff's federally protected civil rights.

109.    Plaintiff suffered and continues to suffer irreparable injury and monetary damages in an amount to be determined at trial and is entitled to an award of punitive damages, costs and attorneys' fees, and any such other relief this Court may find just and proper.

**COUNT TWO**

**(Retaliation under Title VII)**

110.    Plaintiff repeats and realleges the previous allegations as if fully stated herein.

111.    Title VII contains an express prohibition against employer retaliation, which prohibits an employer from discriminating against an individual "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).

112.    Plaintiff complained about the discrimination he was experiencing on multiple occasions.

113.    In retaliation, Plaintiff suffered multiple adverse employment actions, including, inter alia: i) Instituting and maintaining policies that prevented Plaintiff from obtaining the role of Professor under the same conditions and terms as that of his white counterparts; ii) instituting and maintaining policies that prevented Plaintiff from obtaining the role of Department under the same conditions and terms as that of his white counterparts; iii) applying its rules in an arbitrary manner whereby white faculty members receive no discipline for human rights violations but Plaintiff's conduct is reviewed with the highest level of scrutiny; and iv) applying its rules in an unequal manner whereby it investigated the complaints of white faculty members but dismiss and disregard complaints by Plaintiff.

114.    Defendant's conduct was outrageous, malicious, and in reckless or intentional

disregard of Plaintiff's federally protected civil rights.

115.    Plaintiff suffered and continues to suffer irreparable injury and monetary damages in an amount to be determined at trial and is entitled to an award of punitive damages, costs and attorneys' fees, and any such other relief this Court may find just and proper.

## COUNT THREE

### (Discrimination Based on Race Under 42 U.S.C. § 1981)

116.    Plaintiff repeats and realleges the previous allegations as if fully stated herein.

117.    Section 1981 affords to all persons equal rights to make and enforce contracts, which includes "the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship." 42 U.S.C. § 1981(a),(b).

118.    At all times relevant herein, Defendant was an employer within the meaning of Section 1981.

119.    At all times relevant herein, Plaintiff was an employee of Defendant.

120.    From 1999 through 2012, Defendant prevented and/or barred Plaintiff from being promoted to the rank of Professor because of his race and/or national origin, as a result of its discriminatory policies and procedures.

121.    From 1999 through June 2017, Defendant prevented and/or barred Plaintiff from serving as the FFS Department Chair because of his race and/or national origin, as a result of its discriminatory policies and procedures.

122.    From July 2009 and continuing, Defendant has dismissed, minimized, and/or ignored Plaintiff's complaints of discrimination, harassment, and/or a hostile work environment.

123.    In or around March 20, 2020, Defendant subjected Plaintiff to discriminatory and/or unjust discipline in the form of revoking Plaintiff's evaluator/supervisory privileges revoked,

removing Plaintiff's supervisory authority and isolating Plaintiff's office away from his white and/or Caucasian colleagues.

124.    Plaintiff suffered and continues to suffer irreparable injury and monetary damages in an amount to be determined at trial, as well as punitive damages, costs and attorneys' fees, and any other relief this Court may find just and proper.

## COUNT FOUR

**(Discrimination based upon Race and National Origin Under NYSHRL)**

125.    Plaintiff repeats and realleges the previous allegations as if fully stated herein.

126.    At all times relevant herein, Plaintiff was a member of protected classes under the New York Executive Law § 296 ("New York State Human Rights Law" or "NYSHRL") as a black male who originated from the Democratic Republic of the Congo.

127.    At all times relevant herein, Defendant had four (4) or more persons in its employ and thus was qualified as an "employer" within the meaning of the NYSHRL.

128.    Defendant has consistently discriminated against Plaintiff on the basis of race and national origin.

129.    Specifically, Defendant's discriminatory acts include, inter alia: i) Instituting and maintaining policies that prevented Plaintiff from obtaining the role of Professor under the same conditions and terms as that of his white counterparts; ii) instituting and maintaining policies that prevented Plaintiff from obtaining the role of Department Chair under the same conditions and terms as that of his white counterparts; iii) applying its rules in an arbitrary manner whereby white faculty members receive no discipline for human rights violations but Plaintiff's conduct is reviewed with the highest level of scrutiny; and iv) applying its rules in an unequal manner whereby it investigated the complaints of white faculty members but dismiss and disregard complaints by Plaintiff.

130.    The above discriminatory treatment by Defendant, its agents and employees, due to Plaintiff's protected classes violates the NYSHRL.

131.    As a proximate result of Defendant's unlawful conduct, intentional, negligent, and reckless behavior, and violations of Federal and New York State laws, Plaintiff has suffered substantial past and future economic damages; compensatory damages, including, but not limited to fear, personal humiliation and degradation; pain and suffering; mental and emotional distress; and other incidental damages and expenses.

132.    Plaintiff suffered and continues to suffer irreparable injury and monetary damages in an amount to be determined at trial, and is entitled to an award of punitive damages, costs and attorneys' fees, and any such other relief this Court may find just and proper.

## COUNT FIVE
### (Retaliation Under NYSHRL)

133.    Plaintiff repeats and realleges the previous allegations as if fully stated herein.

134.    At all times relevant herein, Plaintiff was a member of protected classes under the NYSHRL as a black male who originated from the Democratic Republic of the Congo.

135.    At all times relevant herein, Defendant had four (4) or more persons in its employ and thus was qualified as an "employer" within the meaning of the NYSHRL.

136.    Plaintiff made multiple complaints to the FSS Department about the systemic racism and hostile work environment based on race.

137.    In response, Defendants failed to engage in remedial action, and instead, retaliated against Plaintiff.

138.    Specifically, Defendant's retaliatory acts include, inter alia: i) Instituting and maintaining policies that prevented Plaintiff from obtaining the role of Professor under the same conditions and terms as that of his white counterparts; ii) instituting and maintaining policies that

prevented Plaintiff from obtaining the role of Department under the same conditions and terms as that of his white counterparts; iii) applying its rules in an arbitrary manner whereby white faculty members receive no discipline for human rights violations but Plaintiff's conduct is reviewed with the highest level of scrutiny; and iv) applying its rules in an unequal manner whereby it investigated the complaints of white faculty members but dismiss and disregard complaints by Plaintiff.

139.    The above retaliatory treatment by Defendant, its agents and employees due to Plaintiff's opposition to Defendant's unlawful and/or discriminatory practices is in violation of the NYSHRL.

140.    As a proximate result of Defendant's unlawful conduct, intentional, negligent, and reckless behavior, and violations of Federal and New York State laws, Plaintiff has suffered substantial past and future economic damages; compensatory damages, including, but not limited to fear, personal humiliation and degradation; pain and suffering; mental and emotional distress; and other incidental damages and expenses.

141.    Plaintiff suffered and continues to suffer irreparable injury and monetary damages in an amount to be determined at trial, and is entitled to an award of punitive damages, costs and attorneys' fees, and any such other relief this Court may find just and proper.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests judgment as follows:

A.    An order declaring that Defendant has violated the anti-discriminatory provisions of Title VII, the NYSHRL, and 42 U.S.C. § 1981;

B.    An order declaring that Defendant has violated the anti-retaliatory provisions of the

NYSHRL;

C.   An order enjoining Defendant from engaging in unlawful conduct alleged within this Complaint at any time in the future;

D.   An award of all damages under applicable law, including compensatory damages, liquidated damages and punitive damages;

E.   An award of Plaintiff's reasonable attorneys' fees and costs, pursuant to 42 U.S.C. § 1988 and 42 U.S.C. § 2000e-5(k); and

F.   An award of such other legal and equitable relief as the Court deems just and proper.

Dated: New York, New York
       December 27, 2022

Respectfully submitted,

Chaya Gourarie, Esq.
Tully Rinckey PLLC
777 Third Ave., 21st. Fl
New York, NY 10017
T: 646-813-2965
cgourarie@tullylegal.com

TO:

HAMILTON COLLEGE
198 College Hill Road
Clinton, NY 13323