**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**JOSEPH MWANTUALI,**

                                        **Plaintiff,**

    **vs.**

                                                            **6:22-CV-1395**
                                                            **(MAD/ML)**

**HAMILTON COLLEGE,**

                                        **Defendant.**
_____

**APPEARANCES:**                          **OF COUNSEL:**

**BELL LAW GROUP, PLLC**                   **CHAYA M. GOURARIE, ESQ.**
116 Jackson Avenue
Syosset, New York 11791
Attorney for Plaintiff

**BOND SCHOENECK & KING, PLLC**            **JONATHAN B. FELLOWS, ESQ.**
One Lincoln Center                         **SUZANNE M. MESSER, ESQ.**
Syracuse, New York 13202
Attorneys for Defendant

**Mae A. D'Agostino, U.S. District Judge:**

### MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

On December 27, 2022, Plaintiff Joseph Mwantuali ("Plaintiff") commenced this action

against Defendant Hamilton College ("Defendant"), alleging employment discrimination, a

hostile work environment, and retaliation in violation of Title VII of the Civil Rights Act of 1964

("Title VII"), 42 U.S.C. § 1981, and the New York Executive Law § 296 ("New York State

Human Rights Law" or "NYSHRL").  *See* Dkt. No. 1 at ¶ 4.

Before bringing this case in federal court, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on January 13, 2021. *See id.* at ¶ 7. On September 29, 2022, the EEOC dismissed Plaintiff's charge without making findings on the merits and issued a Notice of Right to Sue. *See* Dkt. No. 1-1. On March 28, 2023, Defendant filed a motion to dismiss, arguing that Plaintiff's discrimination claims are time barred and that the remaining claims should be dismissed for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See* Dkt. No. 11-4 at 7-15.

## II. BACKGROUND

**A.    The Parties**

According to the complaint, Defendant is an educational corporation organized and existing under the laws of the State of New York. *See* Dkt. No. 1 at ¶ 14.

Plaintiff is a Black man and an immigrant from the Democratic Republic of the Congo. *See id.* at ¶ 3. Plaintiff has worked for Defendant since 1995, when he was hired as an Assistant Professor in Defendant's French and Francophone Studies Department ("FFS Department"). *See id.* at ¶ 19. In 1999, "Plaintiff secured his tenure with Defendant," *id.* at ¶ 20, and in 2012 Plaintiff was promoted and "became a full [p]rofessor." *Id.* at ¶ 21.

Plaintiff's claims arise from allegations about discriminatory treatment in the FFS Department. From 2004 through 2012, the FFS Department had only five faculty members; Plaintiff, three white women, and one white man. *See id.* at ¶ 24. Since 2012, there have been visiting and adjunct professors but, for his entire time as a faculty member in the FFS Department, Plaintiff has been "the only black faculty member." *Id.* at ¶¶ 22, 25. Plaintiff lists several people who have served as Dean of Faculty, all of whom are "white/Caucasian." *Id.* at ¶¶ 27-35.

**B.      Plaintiff's Promotion to Professor**

Defendant had a policy of elevating candidates to professorship based on recommendations from department faculty and a Committee on Appointments. *Id.* at ¶ 40. Plaintiff alleges that this policy "was discriminatory" because "none of his colleagues could support his nomination for the rank of Professor" despite his eligibility. *Id.* at ¶¶ 40-42.

Plaintiff alleges that, beginning in 2004, he was eligible and qualified for professorship. *See id.*  Around 2012, Plaintiff asked Professor Roberta Krueger ("Professor Krueger"), a white female colleague, to support his nomination for promotion to professor, and Professor Krueger declined to do so, citing "the pretextual need for Plaintiff to produce book contracts." *Id.* at ¶¶ 45-46.  Plaintiff complained to Dean Patrick Reynold that, even though he had two signed book contracts, no one had nominated him for promotion. *Id.* at ¶¶ 47-49.  The Dean did not engage in any subsequent remedial actions and Plaintiff subsequently nominated himself. *Id.*  In or around August 2012, Plaintiff was granted full professor rank. *Id.* at ¶ 50.

**C.      Plaintiff's Complaints Against Professor Kreuger**

The next year, Professor Kreuger and other FFS Department faculty supported Cheryl Morgan ("Professor Morgan"), a white woman, in her nomination for professorship. *Id.* at ¶¶ 44, 52-53.  Plaintiff alleges that Professor Morgan lacked the requisite publishing contracts and was a less qualified applicant than he was. *Id.*

Around November 2014, Plaintiff "submitted an internal complaint to the FFS Department," alleging that Professor Krueger had nominated a "less qualified white applicant," instead of Plaintiff. *Id.* at ¶ 56; *see also id.* at ¶ 79.  Professor Morgan then "advised that she 'hated' Plaintiff." *Id.*  Although Plaintiff does not allege that he reported the comment, he states that the FFS Department did not engage in any subsequent remedial actions. *Id.* at ¶ 57.

Plaintiff alleges that Defendant "did not take appropriate and/or corrective action" in response to his complaint, and instead of taking remedial action, Defendant asked Professor Krueger to be on the Committee of Appointment.  *Id.* at ¶ 79.

**D.    Plaintiff's Nomination to FFS Department Chair**

To be eligible to serve as FFS Department Chair a candidate must have (1) tenure; and (2) at least the rank of associate professor.  *Id.* at ¶¶ 58-61.  Plaintiff has met the requirements and been eligible to be nominated to serve as the FFS Department Chair since 1999.  *Id.*  Although all other members of the FFS Department have served at least two terms as Chair, as of June 2016, Plaintiff "was the only FFS Department faculty member who had not been nominated and/or served as the FFS Department Chair."  *Id.* at ¶ 62.

Around June 2016, Dean Gentry solicited nominations for the next FFS Department Chair. *Id.* at ¶¶ 63-64.  In response to Dean Gentry's solicitation, Plaintiff informed Dean Gentry that he should be considered for the position.  *Id.*  Plaintiff informed Dean Gentry that, although he was "the only FFS Department faculty member who had never been nominated as Chair," his colleagues "did not support and would not nominate" him for the position.  *Id.*  Despite Plaintiff's request, Professor Morgan was appointed to serve a second term as FFS Department Chair.  *Id.* at ¶ 65.

Plaintiff complained to Dean Gentry that Professor Morgan's appointment was discriminatory because he had seniority over her.  *Id.* at ¶ 67.  Dean Gentry informed Plaintiff that Professors Krueger, Guyot-Bender, and Morgan had all opposed his nomination for Department Chair.  *Id.*

Around October and November 2016, Plaintiff complained to Phyllis Breband ("Ms. Breband"), Defendant's Interim Director of Diversity and Inclusion, regarding "Defendant's

4

discriminatory practices" that he believed had kept him from being appointed to the FFS Department Chair position.  *Id.* at ¶ 70.  After Ms. Breband intervened, Plaintiff became FFS Department Chair in 2018.  *See id.* at ¶ 71.

**E.    Professor Mouflard's Complaint Against Plaintiff**

Around May 2019, Professor Mouflard filed a complaint against Plaintiff, alleging that he had harassed and intimidated her.  *See id.* at ¶ 82.  Defendant assigned two investigators to investigate Professor Mouflard's allegations as part of a year-long investigation.  *See id.* at ¶¶ 83-84.

Professor Oerleman, a white man who is "friends with Professors Guyot-Bender and [ ] Morgan," was one of the supervisors on the committee.  *Id.* at ¶ 86.  Dean Keen denied Plaintiff's request not to have Professor Oerleman on the committee.  *See id.* at ¶ 89.[1]  Plaintiff asserts that Professor Oerleman's position on the committee "was premised on bias and guaranteed that the investigation would be unjust."  *Id.* at ¶ 86.

Plaintiff stepped down from his position as FFS Department Chair in June 2019 because "the increased hostility and discrimination became intolerable."  *Id.* at ¶¶ 74, 84.  On March 20, 2020, "Dean Keen issued a decision *against* Plaintiff," which Plaintiff claims "reeks of bias and inequality[.]"  *Id.* at ¶ 85.  As part of her decision, Dean Keen "removed Plaintiff's evaluator/supervisory duties, barred Plaintiff from serving in a position of authority over Professor Mouflard and relocated Plaintiff's office."  *Id.*  Plaintiff is still assigned to that relocated office and alleges that it isolates him from his colleagues.  *See id.*

**F.    Plaintiff's Complaints Against Professor Guyot-Bender**

---

[1] Although Plaintiff makes several assertions that "Professor Oerleman was clearly biased against Plaintiff," the complaint contradictorily states: "Thus, the investigation was utterly impartial from the start."  *Id.* at ¶ 89.

Plaintiff contends that, from 1997 to the filing of this action, Professor Guyot-Bender "has taunted [him] with attempts to engage in confrontations ('Let's fight'); made racially stereotypical remarks; invaded his and his family's privacy by showing-up unsolicited to [his] residence; spread rumors about [his] son and his disability; and threatened to 'isolate' [him]." *Id.* at ¶ 91.

Plaintiff has reported Professor Guyot-Bender's discriminatory and harassing conduct to Defendant several times since 2008, but Defendant has not taken any remedial actions. *See id.* at ¶ 91. Plaintiff complained about Professor Guyot-Bender's "bullying, intimidation, threats, and harassment," in July 2009, and Defendant failed to take any action in response. *Id.* at ¶¶ 75-78.

In April 2020, Plaintiff filed an internal complaint against Professor Guyot-Bender "alleging discrimination and harassment based on sex and race." *Id.* at ¶ 93. Plaintiff alleges that his complaint was not treated equally with the complaint Professor Mouflard filed against Plaintiff. *See id.* at ¶ 94. Specifically, that Professor Guyot-Bender was given more time to respond to investigative questions than Plaintiff had been given when he was investigated for Professor Mouflard's complaint. *See id.* Professor Guyot-Bender was given access to more information for the complaint filed against her than Plaintiff had been given while Professor Mouflard's complaint was investigated. *See id.* Plaintiff's request for an extension was also denied, whereas Professor Mouflard "was not denied an extension"[2] for her complaint against Plaintiff. *Id.* Plaintiff withdrew his complaint against Professor Guyot-Bender in "late 2020 . . . due to the biased and discriminatory handling of the investigation." *Id.* at ¶ 97.

## G.    Plaintiff's Other Claims of Discrimination

Plaintiff alleges that Professor Oerleman abused his position of authority to discriminate against Plaintiff and create a hostile working environment. Professor Oerleman was appointed

---

[2] Plaintiff does not claim that Professor Mouflard ever requested an extension.

Associate Dean and then Department Chair in 2019 after Plaintiff stepped down. *See id.* at ¶ 87. As FFS Department Chair, Professor Oerleman allegedly isolated Plaintiff from his colleagues, created a hostile work environment, and excluded him from "important department meetings." *Id.* at ¶ 88. Plaintiff contends that Professor Oerleman also discriminated against him while on the committee reviewing Professor Mouflard's complaint. *See id.*

Plaintiff alleges that Professors Guyot-Bender, Moufllard, and Morgan discriminated against him by hosting meetings at their homes on weekends and not inviting him, and by "choosing Teaching Assistants" without his input while he was Department Chair. *Id.* at ¶ 73.

Plaintiff claims that he "made additional complaints about discrimination in connection with how the Department handled Professor Mouflard's complaint against him [in contrast to how it] handled his complaint against Professor Guyot-Bender." *Id.* at ¶ 80. Plaintiff contends that Defendant had an "Affirmative Action Policy" which was not implemented "during Plaintiff's entire tenure with Defendant," and which Defendant did not adhere to while investigating Plaintiff's various complaints. *See id.* at ¶ 81.

Plaintiff alleges that on or about 2016, "a group of outside professors conducted a review of the FFS Department due to complaints about lack of diversity" (the "Department Review"). *Id.* at ¶ 36. The Department Review included a finding that "[n]ot all members of the department feel they have a full voice." *Id.* The Department Review also recommended several remedial actions, including appointing "outside members to the search committee" for Department Chair and developing clear rules for when a consensus cannot be reached. *Id.* at ¶¶ 36, 67. Plaintiff alleges that the Dean disregarded the recommendations in the Department Review, and that doing so was an explicit sanctioning of the existing racism in the department." *Id.* at ¶¶ 37-38.

**H.      Plaintiff's Claims and Defendant's Motion**

Plaintiff alleges that the FFS Department and Professor Krueger discriminated against him "based upon his national origin and/or race" by preventing his nomination for professorship from 2004, when he was first eligible, to 2012, when he was granted professorship. *Id.* at ¶ 54. Plaintiff claims that the lack of support for his nomination was discriminatory because his white colleagues were nominated with the support of the FFS Department despite having fewer qualifications than he had. *Id.* at ¶ 54. The eight-year delay in being granted professorship caused Plaintiff "reputational harm that has impacted his career trajectory until today," as well as "mental anguish, and emotional pain and distress," because his delayed promotion was "premised wholly on racial animus." *Id.* at ¶ 55. Plaintiff asserts that, because he was promoted to professor in 2012, his "qualifications were never doubted," and the fact that he was not sooner nominated and elevated is due "solely [to] his race and national origin." *Id.* at ¶ 51.

Plaintiff alleges that Dean Gentry and the FFS Department "deliberately prevented [his] appointment [to] FFS Department Chair due to his race and/or national origin," and "in retaliation for [his] opposition to Defendant's discriminatory practices." *Id.* at ¶¶ 68, 69. Plaintiff contends that the "long and undeserved delay" in serving as FFS Department Chair caused "significant reputational harm that has impacted his career trajectory until today," and caused him "significant mental anguish, and emotional pain and distress, as it was premised wholly on racial animus." *Id.* at ¶ 72.

Plaintiff alleges that Defendant did not properly address his complaints against Professor Krueger. *See id.* at ¶ 79. Plaintiff also claims that Defendant imposed discriminatory sanctions on him as part of its resolution of Professor Mouflard's complaint against him. *See id.* at ¶¶ 85, 123.

Plaintiff alleges that in contrast to Professor Mouflard's complaint against him, his

complaint against Professor Guyot-Bender was treated with partiality. *See id.* at ¶ 80. Plaintiff includes letters from other faculty members who offer their opinions that the "disparity in how the Department handled Plaintiff's complaint versus how [the Department and Dean Keen] handled Professor Mouflard's complaint" and the procedural inequalities were due to "implicit bias and systemic racism" in the FFS Department. *Id.* at ¶ 95; *see also id.* at ¶¶ 3, 85, 90, 96.

In its motion to dismiss, Defendant contends (1) that Plaintiff's claims are time-barred, and (2) that Plaintiff failed to state a claim. *See* Dkt. No. 21. Specifically, Defendant argues that "any claim based on the alleged delay in promoting [Plaintiff] to full professor until 2012 is time barred" and Plaintiff cannot rely on the continuing violation doctrine. Dkt. No. 11-4 at 13. Defendant argues that Plaintiff failed to state a claim because the complaint fails to allege that there was any adverse employment action or that there was a hostile work environment. *See id.* at 5. Plaintiff opposes Defendant's motion. *See* Dkt. No. 20.

### III. DISCUSSION

**A.     Motion to Dismiss**

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the party's claim for relief. *See Patane v. Clark*, 508 F.3d 106, 111-12 (2d Cir. 2007) (citation omitted). In considering the legal sufficiency, a court must accept as true all well-pleaded facts in the pleading and draw all reasonable inferences in the pleader's favor. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (citation omitted). This presumption of truth, however, does not extend to legal conclusions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Although a court's review of a motion to dismiss is generally limited to the facts presented in the pleading, the court may consider documents that are "integral" to that pleading, even if they are

neither physically attached to, nor incorporated by reference into, the pleading.  *See Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002)).

To survive a motion to dismiss, a party need only plead "a short and plain statement of the claim," *see* FED. R. CIV. P. 8(a)(2), with sufficient factual "heft to 'sho[w] that the pleader is entitled to relief.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (quotation omitted). Under this standard, the pleading's "[f]actual allegations must be enough to raise a right of relief above the speculative level," *see id.* at 555 (citation omitted), and present claims that are "plausible on [their] face."  *Id.* at 570.  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'"  *Id.* (quoting *Twombly*, 550 U.S. at 557).  Ultimately, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," *Twombly*, 550 U.S. at 558, or where a plaintiff has "not nudged [its] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed."  *Id.* at 570.

## B.     Timeliness

Central to Defendant's motion is its contention that Plaintiff's claims are barred by the applicable statutes of limitations.  *See generally* Dkt. No. 11-4 at 12-16.

### 1. Statutes of Limitations

"Generally, dismissal based on the statute of limitation under Rule 12(b)(6) is 'irregular' and must usually wait until a later stage of the proceedings."  *Kelley v. Ithaca Coll.*, No. 3:18-CV-1082, 2019 WL 13300906, *6 (N.D.N.Y. June 18, 2019) (quoting *U.S. v. N. Tr. Co.*, 372 F.3d

10

886, 888 (7th Cir. 2004)).  "Dismissal of a claim at the pleading stage based on a statute of limitations affirmative defense 'is appropriate only if a complaint clearly shows the claim is out of time.'"  *Id.* (quoting *Harris v. City of New York*, 186 F.3d 243, 250 (2d Cir. 1999)) (other citations omitted).

Before filing a suit in federal court under Title VII, "the claimant must make the EEOC filing within 300 days of the alleged discriminatory conduct and, before bringing suit, must receive a 'Notice of Right to Sue' letter from the EEOC."  *Williams v. New York City Hous. Auth.*, 458 F.3d 67, 69 (2d Cir. 2006) (citing *Legnani v. Alitalia Linee Aeree Italiane, S.P.A.*, 274 F.3d 683, 686 (2d Cir. 2001)) (other citation omitted).  "Although the exhaustion of administrative remedies through filing with the EEOC is not a jurisdictional requirement, 'it remains . . . an essential element of Title VII's statutory scheme, . . . and one with which defendants are entitled to insist that plaintiffs comply.'"  *Muhammad v. N.Y.C. Transit Auth.*, 450 F. Supp. 2d 198, 205 (E.D.N.Y. 2006) (quoting *Francis v. City of New York*, 235 F.3d 763, 768 (2d Cir. 2000)).  Courts have noted that "[t]he 300-day limitations period is not a jurisdictional prerequisite to suit in federal court; it is 'a requirement that, like a statute of limitations, is subject to waiver, estoppel and equitable tolling,'" *Mauro v. Bd. of Higher Educ.*, 658 F. Supp. 322, 324 (S.D.N.Y. 1986) (citing *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982) (internal quotations omitted)), as well as the continuing violation doctrine.  *See Cruz v. City of New York*, No. 21-CV-1999, 2021 WL 5605139, *4 (S.D.N.Y. Nov. 30, 2021).

Plaintiff exhausted his remedies prior to filing his complaint by filing a charge of discrimination with the EEOC on January 13, 2021.  *See* Dkt. No. 1 at ¶ 7; Dkt. No. 1-1 at 2; *see also Deravin v. Kerik*, 335 F.3d 195, 200 (2d Cir. 2003) ("As a precondition to filing a Title VII claim in Federal court, a plaintiff must first pursue available administrative remedies and file a

timely complaint with the EEOC").  As such, Plaintiff's Title VII claims must arise from events that occurred after March 19, 2020, 300-days prior to his filing with the EEOC.[3]  Barring an exception, any claims that accrued prior to March 19, 2020, are time barred.

The statute of limitations for employment discrimination and retaliation claims brought under § 1981 is four years, and for claims under the NYSHRL claims it is three years.  *See Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382 (2004); *Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 248-49 (E.D.N.Y. 2012).  Discrete acts of discrimination occurring outside the statutory period are not actionable under § 1981 or the NYSHRL.  *See Washington v. Cnty. of Rockland*, 373 F.3d 310, 317-18 (2d Cir. 2004) (§ 1981); *Bonner v. Guccione*, 178 F.3d 581, 584 (2d Cir. 1999) (NYSHRL).

The statute of limitations for Plaintiff's NYSHRL claims is tolled during the pendency of Plaintiff's complaint with the EEOC.[4]  *See Lent v. CCNH, Inc.*, No. 5:13-CV-942, 2015 WL 3463433, *8 (N.D.N.Y. June 1, 2015) (citation omitted) (holding that the [p]laintiff's claims under the NYSHRL were timely filed, as the three-year statute of limitations was tolled during the pendency of Plaintiff's complaint with the EEOC").  Therefore, any discrete acts of discrimination occurring before April 12, 2018, are untimely.[5]

---

[3] Plaintiff appropriately filed his complaint on December 27, 2022, eighty-nine days after receiving the right-to-sue letter by the EEOC on September 29, 2022.  *See Bamba v. Fenton*, 758 Fed. Appx. 8, 11 (2d Cir. 2018) (holding that the plaintiff did not act with due diligence where she claimed that she did not originally receive the right-to-sue letter when mailed by the EEOC, but still failed to file her complaint within ninety days of receipt of the second right-to-sue letter sent by the EEOC).  Therefore, Plaintiff's Title VII claims that are timely under the EEOC time requirements are not otherwise barred.

[4] Plaintiff filed his charge with the EEOC on January 13, 2021, and received a notice of right-to-sue on September 29, 2022, six-hundred and twenty-four days later.  *See* Dkt. No. 1 at ¶¶ 7-8.

[5] Three years before when Plaintiff filed his complaint is December 27, 2019, but accounting for the six-hundred and twenty-four days his complaint was pending with the EEOC, April 12, 2018, is the relevant date.

Whereas a plaintiff who exhausts administrative remedies on a claim may toll the statute of limitations on an "identical claim," the Supreme Court has found that it is not appropriate to toll the statute of limitations on a § 1981 claim while a plaintiff exhausts administrative remedies for a similar Title VII claim.  *See Johnson v. Railway Express Agency, Inc.*, 421 U.S. 465 (1975). In *Johnson*, Supreme Court held that "Congress clearly has retained § 1981 as a remedy against private employment discrimination separate from and independent of the more elaborate and time-consuming procedures of Title VII."  *Id.* at 466.  Accordingly, tolling does not apply to Plaintiff's § 1981 claims.  Plaintiff's claims under § 1981 must not contain discrete acts of discrimination before December 27, 2018.[6]

### 2. The Continuing Violation Doctrine

A Plaintiff's claims may prevail as to events that predate the statute of limitations period if the "'continuing violation' exception to the normal knew-or-should-have-known accrual date of a discrimination claim" applies.  *Kelley*, 2019 WL 13300906, at *6 (quoting *Harris*, 186 F.3d at 250).  Under the continuing violation doctrine, if Plaintiff has experienced a "continuous practice and policy of discrimination, . . . the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it."  *Fitzgerald v. Henderson*, 251 F.3d 345, 359 (2d Cir. 2001) (internal quotations and citations omitted).  "If a continuing violation is shown, a plaintiff is entitled to have a court consider all relevant actions allegedly taken pursuant to the employer's discriminatory policy or practice, including those that would otherwise be time barred."  *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 713 (2d Cir. 1996).  "[I]f a Title VII plaintiff files an EEOC charge that is timely as to any incident of discrimination in

---

[6] December 27, 2018, is four years before December 27, 2022, when Plaintiff filed his complaint. *See* Dkt. No. 1.

furtherance of an ongoing policy of discrimination, all claims of acts of discrimination under that policy will be timely, even if they would be untimely standing alone." *Chin v. Port Auth. of New York & New Jersey*, 685 F.3d 135, 155-56 (2d Cir. 2012) (internal quotation marks omitted).

"[A] continuing violation may be found 'where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice.'" *Fitzgerald*, 251 F.3d at 359 (citations omitted).  "[T]he plaintiff must allege both the existence of an ongoing policy of discrimination and some non-time-barred acts taken in furtherance of that policy." *Rivas v. New York State Lottery*, 745 Fed. Appx. 192, 193 (2d Cir. 2018) (quoting *Fahs Constr. Grp., Inc. v. Gray*, 725 F.3d 289, 292 (2d Cir. 2013)).

"However, this doctrine is inapplicable to 'discrete acts' of discrimination, even if they are 'related to acts alleged in timely filed charges.'" *Le v. New York State, Off. of State Comptroller*, No. 1:16-CV-1517, 2017 WL 3084414, *5 (N.D.N.Y. July 18, 2017) (quoting *Edner v. NYCTA-MTA*, 134 F. Supp. 3d 657, 664 (E.D.N.Y. 2015) (other citations omitted).  Therefore, it is not sufficient to plead "'multiple incidents of discrimination, even similar ones, that are not the result of a discriminatory policy or mechanism.'" *Troeger v. Ellenville Cent. Sch. Dist.*, No. 10-CV-718, 2012 WL 1605532, *3 (N.D.N.Y. May 8, 2012) (quoting *Valtchev v. City of New York*, 400 Fed. Appx. 586, 588-89 (2d Cir. 2010)).

Courts in the Second Circuit generally disfavor the continuing violation doctrine and have declined to extend its applicability absent compelling circumstances.  *See Cotz v. Matroeni*, 476 F. Supp. 2d 332, 356 (S.D.N.Y. 2007) ("Courts in the Second Circuit view continuing violation arguments with disfavor, and the doctrine's applicability outside of the Title VII or discrimination context is uncertain"); *Trinidad v. New York City Dep't of Corr.*, 423 F. Supp. 2d 151, 165 n.11

14

(S.D.N.Y. 2006) ("As a general matter, the continuing violation doctrine is heavily disfavored in the Second Circuit and courts have been loath to apply it absent a showing of compelling circumstances").  "Such compelling circumstances include 'unlawful conduct tak[ing] place over a period of time, making it difficult to pinpoint the exact day the violation occurred; where there is an express, openly espoused policy that is alleged to be discriminatory; or where there is a pattern of covert conduct such that the plaintiff only belatedly recognizes its unlawfulness.'" *Clemmons v. Holder*, No. 13-CV-7229, 2015 WL 4894184, *5 (E.D.N.Y. Aug. 17, 2015) (quoting *Koehl v. Greene*, No. 06-CV-0478, 2007 WL 2846905, *7-9 (N.D.N.Y. Sept. 26, 2007)) (other citation omitted).  "At this pleading stage the focus is on whether [P]laintiff has sufficiently pled a continuing violation so as to extend the statute of limitations." *Coleman v. B.G. Sulzle, Inc.*, 402 F. Supp. 2d 403, 414 (N.D.N.Y. 2005).

Hostile work environment claims are treated with a different approach because "their very nature involves repeated conduct, the 'unlawful employment practice,' § 2000e—5(e)(1), cannot be said to occur on any particular day.  It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 103 (2002).  Courts must consider "all of the circumstances," and assess the cumulative effect of individual actions in aggregate to determine if the plaintiff has alleged an "unlawful employment practice." *Id.* at 118.

The Second Circuit has clarified that "[i]n order for a timely incident to prolong a hostile work environment created by earlier action, the timely incident must be sufficiently related to the prior events so that they can be said to be part of the 'same' hostile work environment." *Sanderson v. New York State Elec. & Gas Corp.*, 560 Fed. Appx. 88, 91 (2d Cir. 2014) (citing *Morgan*, 536 U.S. at 118).  Courts in the Second Circuit have adopted a three-factor test

15

established by the Fifth Circuit in *Berry v. Board of Supervisors* to evaluate continuing violations

in hostile work environment claims:

> "The first [inquiry] is subject matter.  Do the alleged acts involve
> the same type of discrimination, tending to connect them in a
> continuing violation?  The second is frequency.  Are the alleged
> acts recurring . . . or more in the nature of an isolated work
> assignment or employment decision?  The third factor, perhaps of
> most importance, is degree of permanence.  Does the act have the
> degree of permanence which should trigger an employee's
> awareness and duty to assert his or her rights[?]"

*Riedinger v. D'Amicantino*, 974 F. Supp. 322, 326 (S.D.N.Y. 1997) (quoting *Berry v. Bd. of*

*Supervisors*, 715 F.2d 971, 981 (5th Cir. 1983)).  To file a timely hostile work environment claim,

the plaintiff need only show that one of the contributing acts occurred within the statute of

limitations.  *See Cornwell v. Robinson*, 23 F.3d 694, 703-04 (2d Cir. 1994).

### 3. Timeliness Application

Plaintiff's allegations of discrimination are supported by five general factual allegations:

(1) failure to promote Plaintiff to professor sooner; (2) failure to promote Plaintiff to FFS

Department Chair sooner; (3) Defendant's discriminatory investigation of human rights

complaints; (4) Defendant's policies had a disparate impact; and (5) Defendant created a hostile

work environment.

#### a. Failure to Promote to Professor

Plaintiff's claims related to the failure to promote him to professor concern events between

1999, when Plaintiff was first eligible for professorship, and 2012, when he was promoted.  *See*

Dkt. No. 1 at ¶ 120.  Accordingly, all claims relating to his promotion to professorship are

untimely under all applicable statutes of limitations.  Plaintiff's claims for failure to promote him

prior to 2012 are not saved by the continuing violation doctrine because they do not relate to any

event alleged during the applicable statutes of limitation before Plaintiff filed his EEOC complaint. *See Chandrapaul v. City Univ. of New York*, No. 14-CV-790, 2016 WL 1611468, *14 (E.D.N.Y. Apr. 20, 2016) (finding that the continuing violation doctrine did not apply to the plaintiff's claims that she was twice unlawfully denied admission to a nursing program, but later admitted to the program, because the continuing violation exception does not apply to individual instances of discrimination); *Johnson v. N.Y. Univ.*, No. 17-CV-6184, 2018 WL 4908108, *6 (S.D.N.Y. Oct. 10, 2018) (finding the continuing violation doctrine inapplicable where the plaintiff alleged discrete events and failed to allege any ongoing discriminatory policy). Plaintiff's promotion to professor in 2012 was a discrete and independent employment decision, and therefore untimely and not subject to the continuing violations doctrine.[7] *See Nat'l R.R. Passenger Corp.*, 536 U.S. at 114.

### b. Failure to Promote to Department Chair

Plaintiff's claims that Defendant instituted and maintained policies that kept him from being nominated for FFS Department Chair involve incidents beginning in 1999, when he was first eligible for the position, and ending in 2018, when he became Department Chair.[8]  Dkt. No. 1 at ¶¶ 71, 121.  Plaintiff has not alleged that there was any instance of discrimination after Professor Morgan was appointed to Department Chair in 2017 which is part of the same policy

---

[7] To the extent Plaintiff suggests that a court may not rule on whether the continuing violation doctrine applies on a motion to dismiss, *see* Dkt. No. 20 at 11-12, the Court disagrees.  "While Plaintiff is correct that questions of fact concerning the applicability of the continuing violation doctrine could preclude a court from ruling on the issue on a motion to dismiss, . . . courts routinely find that the continuing violation doctrine does not apply via a motion to dismiss," *Doe v. State Univ. of New York Purchase Coll.*, 617 F. Supp. 3d 195, 210 (S.D.N.Y. 2022) (citing *Purcell v. N.Y. Inst. of Tech.-Coll. of Osteopathic Med.*, 931 F.3d 59, 66-66 (2d Cir. 2019); *see also Gonzalez v. Hasty*, 802 F.3d 212, 221-22 (2d Cir. 2015)) (other citations omitted).

[8] Paragraph 65 refers to serving in the chair position for the academic year, and because the complaint does not specify when in 2018 Plaintiff became Department chair, the Court will infer that Plaintiff did so for the 2018 academic year.

that prevented his appointment to Department Chair. *See Chandrapaul*, 2016 WL 1611468, at *14; *Johnson*, 2018 WL 4908108, at *6. Such claims are therefore untimely under Title VII and § 1981.

Plaintiff does not specifically allege when in 2018 he became FFS Department Chair. *See* Dkt. No. 1 at ¶ 71. Construing the ambiguity in Plaintiff's favor, and considering that Plaintiff described Professor Morgan's tenure as FFS Department Chair as "through the 2017 academic year[,]" the Court finds it most likely that Plaintiff was appointed FFS Department Chair —most recently in June 2017— for the 2018 academic year, beginning sometime after June 2018. However, Plaintiff may not claim that the "continual ill effects" of being previously denied FFS Department Chair are a continuing violation that extended past the last time appointments were made. *Hamer v. City of Trinidad*, 924 F.3d 1093, 1099 (10th Cir. 2019) ("An important caveat to the continuing violation doctrine, however, is that it is triggered by continual unlawful acts, not by continual ill effects from the original violation") (citations and quotation marks omitted). As such, Plaintiff's claims are also untimely under the NYSHRL.

### c. Unequal Handling of Complaints

Plaintiff brings retaliation and discrimination claims under § 1981, Title VII and the NYSHRL, alleging that Defendant applied "its rules in an arbitrary manner whereby white faculty members receive no discipline for human rights violations, but Plaintiff's conduct is reviewed with the highest level of scrutiny[.]" Dkt. No. 1 at ¶¶ 104, 113, 129, 138. It is not clear how these claims are distinct from those alleging a discriminatory practice of investigating discrimination and harassment complaints. Accordingly, the Court will consider those allegations together.

Plaintiff claims that Defendant "investigated the complaints of white faculty members but dismissed and disregarded complaints by Plaintiff" in violation of Title VII and the NYSHRL. *Id*.

at ¶¶ 104, 113, 129, 138.  Similarly, Plaintiff claims that Defendant "dismissed, minimized, and/or ignored [his] complaints of discrimination, harassment, and/or a hostile work environment" in violation of § 1981.  *Id.* at ¶ 122.  Plaintiff's complaints include: his 2008 or 2009[9] complaint to Dean Urgo about Professor Guyot-Bender's harassment, *see id.* at ¶¶ 75-78; his 2014 complaint to the FFS Department against Professor Krueger, *see id.* at ¶ 56; his 2016 complaint to Dean Gentry regarding Professor Morgan's appointment, *see id.* at ¶ 66; his October/November 2016 complaint to Ms. Breband about his non-nomination to FFS Department Chair, *see id.* at ¶ 70; and his April 2020 harassment complaint against Professor Guyot-Bender, *see id.* at ¶ 93.

Plaintiff alleges that he made three complaints prior to the limitations period.  Plaintiff alleges that the manner in which Defendant handled his July 2008 or 2009 complaint to Dean Urgo, his 2016 complaint to Dean Gentry, and his November 2014 complaint to the FFS Department were not discrete acts, but part of a discriminatory policy of "handling [] complaints of discrimination" that continued through his April 2020 complaint against Professor Guyot-Bender.[10]  *Id.* at ¶ 93; *see also id.* at ¶¶ 77, 78, 79, 94.  The three complaints that Plaintiff alleges he made before the limitations period were each made to a different person or office, each between two or six years from each other, and at least four years before Plaintiff's complaint within the limitations period.  Plaintiff's complaints are too dissimilar and too far from each other

---

[9] Plaintiff claims that "[f]rom 2008 to the present, Plaintiff has reported Professor Guyot-Bender's discriminatory and harassing conduct to Defendant's administration" *id.* at ¶ 92, and separately states that "[a]s early as July 2009, Plaintiff wrote a letter to Dean Urgo complaining of Professor Guyot-Bender's bullying, intimidation, threats, and harassment."  *Id.* at ¶ 75.

[10] Plaintiff alleges that he "made additional complaints about discrimination in connection with how the Department handled Professor Mouflard's complaint against him, and then handled his complaint against Professor Guyot-Bender" but does not allege when he made those complaints, to whom he made them, or what his particular complaints about the different processes were. Dkt. No. 1 at ¶ 80.  Plaintiff's complaint regarding the complaints he allegedly made about the policy of handling complaints in an unequal manner is vague and lacks the specificity necessary to state a claim.

and from the timely complaint to sufficiently allege a single policy of responding to complaints

and establish a continuing violation.  *See Nazon v. Time Equities, Inc.*, No. 21-CV-8680, 2022

WL 18959570, *9 (S.D.N.Y. Nov. 22, 2022) (holding that discrete acts which took place over

fourteen years, with incidents occurring several years apart and the most recent act outside the

limitations period occurring five years before the conduct within the limitations period, were too

isolated in time from each other and from the timely allegations to constitute a continuing

violation)).

As a result of Professor Mouflard's 2019 complaint against Plaintiff, on March 20, 2020,

Defendant imposed disciplinary actions against Plaintiff.  *See id.* at ¶ 123.  Those actions are

within all three applicable limitation periods.[11]  Professor Mouflard's complaint in May 2019, and

the ensuing investigation, are integrally related to Dean Keen's March 20, 2020, decision on that

complaint, and therefore, under the continuing violation doctrine, is not barred.  Plaintiff's April

2020 complaint against Professor Guyot-Bender is also timely.

### d. Disparate Impact

Plaintiff alleges that he was "disparately impacted" by Defendant's policies which

deprived him of "equal employment opportunities, career growth, and otherwise adversely

affected his status as an employee because of [his] race and/or national origin" in violation of

Title VII and the NYSHRL.  Dkt. No. 1 at ¶¶ 105, 129.  Plaintiff alleges that he was

> subjected to disparate treatment giving rise to an inference of
> discrimination based on his protected classes in the form of threats,
> harassment, intimidation, discipline, and impediments to career
> progression taken and/or caused by Defendant, its agents and
> employees, including, but not limited to Dean Gentry, Dean Keen,
> Dean Reynolds, Dean Urgo, Professor Mouflard and Professor
> Guyot-Bender.

---

[11] Events that occurred after March 19, 2020, are within 300 days before Plaintiff filed his EEOC
charge on January 13, 2021, and therefore timely under Title VII.

*Id.* at ¶ 103.

The only specific "impediments to career progression" that Plaintiff has claimed are his delayed promotion to professorship and FFS Department Chair, both of which are time barred for the reasons stated above. Plaintiff's claims related to Defendant's process for handling his April 2020 complaint, and for addressing Professor Mouflard's complaint on March 20, 2020, are timely under Title VII and the NYSHRL. *See id.* at ¶ 85.

Plaintiff alleges that his colleagues discriminated against him by excluding him from weekend meetings at their homes but does not allege that the meetings took place during the limitations period. *Id.* at ¶ 73. Accordingly, his claims related to the meetings at his colleagues' home are dismissed.

Plaintiff has not alleged that disparate treatment "in the form of threats, harassment, [and] intimidation" *id.* at ¶ 103, was part of "an ongoing policy of discrimination" as required by the continuing violation doctrine. *Rivas*, 745 Fed. Appx. at 193. Nor has Plaintiff alleged any non-time-barred acts taken in furtherance of a policy of "threats, harassment, [and] intimidation[.]" Dkt. No. 1 at ¶ 103. Therefore, such claims are not timely.

### e. Hostile Environment

Plaintiff alleges that Defendant "fostered . . . a hostile work environment by failing and/or refusing to provide a safe environment and to employ procedures to prevent and deal with the discriminatory treatment, and abusive threats, harassment, and intimidation" in the FFS Department. *Id*. at ¶ 106. Plaintiff claims the acts which occurred more than 300 days prior to his EEOC complaint are not time barred because Defendant created a hostile work environment that is part of "the same continuing unlawful course of conduct[.]" Dkt. No. 20 at 9.

Plaintiff's hostile work environment claim is supported in large part by the same

allegations that underlie his claims for disparate treatment and disparate impact, many of which

occurred outside the statutory time limit.  Specifically, he claims "abusive threats, harassment, and

intimidation" by faculty members, Dkt. No. 1 at ¶ 106, and describes an environment since 2009

of "dismiss[ing], minimize[ing], and/or ignore[ing] Plaintiff's complaints of discrimination,

harassment, and/or a hostile work environment", *id.* at ¶ 122, including his 2008 or 2009

complaint to Dean Urgo about Professor Guyot-Bender's harassment, *see id.* at ¶¶ 75-78; his 2014

complaint against Professor Krueger to the FFS Department, *see id.* at ¶ 56; his 2016 complaint to

Dean Gentry regarding Professor Morgan's appointment, *see id.* at ¶ 66; his October/November

2016 complaint to Ms. Breband about his non-nomination to FFS Department Chair, *see id.* at ¶

70; and his April 2020 harassment complaint against Professor Guyot-Bender, *see id.* at ¶ 93.

Plaintiff alleges that he was not given the same time extensions and access to materials as his

white female colleague was given in her complaint against him.  *See id.* at ¶¶ 91-98.

Plaintiff also claims that Professor Guyot-Bender harassed and taunted him because of his

race since 2008, *see id.* at ¶ 92; claims that Professor Oerleman abused his role as the FFS

Department Chair to harass him and exclude him from important meetings, *see id.* at ¶ 88; and

that the white faculty members of the FFS Department orchestrated his delayed promotion to

Department Chair on account of his race.  *See* Dkt. No. 20 at 20.  Plaintiff alleges that his

colleagues in the FFS Department excluded him from meetings at their homes and that from 2019

onwards, Professor Oerleman, as FFS Department Chair, created a "hostile work environment"

and abused "his role as the FFS Department Chair by isolating Plaintiff from his white/Caucasian

colleagues and excluding him from important department meetings."  Dkt. No. 1 at ¶¶ 73, 88.

Plaintiff also alleges that Professor Guyot-Bender "made racially stereotypical remarks; invaded

his and his family's privacy by showing-up unsolicited to [his] residence; spread rumors about [his] son and his disability; and threatened to 'isolate' [him]." *Id.* at ¶ 91.  Plaintiff claims he has suffered "fear, personal humiliation and degradation; pain and suffering; mental and emotional distress" because of the hostile environment in the FFS Department.  *Id.* at ¶ 107.

To the extent that these discrete acts cumulatively create a hostile work environment, the continuing violations doctrine may save these claims under the NYSHRL and Title VII.  *Davis-Garett v. Urb. Outfitters, Inc.*, 921 F.3d 30, 42 (2d Cir. 2019) (quoting *National R.R. Passenger Corp.*, 536 U.S. at 113-14) ("'A charge alleging a hostile work environment claim . . . will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice *and at least one act falls within the time period*'").  Because some of the allegedly discriminatory conduct occurred after April 12, 2018, all the discriminatory acts alleged may be considered timely for the purpose of Plaintiff's state law and Title VII hostile work environment claims.  *See Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 251 (E.D.N.Y. 2012) (denying plaintiff's hostile work environment claim on summary judgment but holding that "all of the discriminatory acts alleged may be considered timely for the purpose of plaintiff's [ ] hostile work environment claim" because "some of the allegedly discriminatory conduct occurred" during the limitations period).

**C.     Discrimination Under Title VII, Section 1981, and the NYSHRL**

*1.  Legal Standards*

"Prior to August 1[2], 2019, the pleading standards were generally the same for Title VII, section 1981, and NYSHRL claims."  *Syeed v. Bloomberg L.P.*, 568 F. Supp. 3d 314, 321 (S.D.N.Y. 2021) (citing *Awad v. City of New York*, No. 13-CV- 5753, 2014 WL 1814114, *5 (E.D.N.Y. May 7, 2014) ("Discrimination claims under § 1981 . . . and [the] NYSHRL are

analyzed under the same framework and pleading standard as Title VII claims") (citations omitted).  In August 2019, the NYSHRL was amended "to direct courts to construe the NYSHRL, like the NYCHRL, 'liberally for the accomplishment of the remedial purposes thereof, regardless of whether federal civil rights laws including those laws with provisions worded comparably to the provisions of [the NYSHRL] have been so construed.'"  *McHenry v. Fox News Network, LLC*, 510 F. Supp. 3d 51, 68 (S.D.N.Y. 2020) (quoting N.Y. Exec. Law § 300).  This amendment is applicable to adverse actions that occurred before it went into effect on August 12, 2019.[12]  *See* L 2019, ch. 160, § 16.

"[B]ecause the NYSHRL was amended to more closely mirror the NYCHRL than Title VII," the Court will analyze Plaintiff's NYSHRL claims for conduct occurring after August 12, 2019, under a different standard which more closely follows the NYCHRL standard.  *Syeed*, 568 F. Supp. 3d at 321 (applying the NYCHRL standard to NYSHRL claims after the 2019 amendments).  The post-2019 Amendment "analysis considers the same three factors analyzed under . . . Title VII, but the claims are 'construed more liberally than their counterparts under Title VII' and the previous version of the NYSHRL.'"  *Id.* (quoting *Fitchett v. City of New York*, No. 18-CV-8144, 2021 WL 964972, *24 (S.D.N.Y. Mar. 15, 2021)).  "Title VII prohibits intentional acts of employment discrimination based on race, color, religion, sex, and national origin, 42 U.S.C. § 2000e-2(a)(1) (disparate treatment), as well as policies or practices that are not intended to discriminate but in fact have a disproportionately adverse effect on minorities, § 2000e-2(k)(1)(A)(i) (disparate impact)."  *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009).

---

[12] "The amendment took effect on the signing date, August 12, 2019, although other parts of the omnibus bill containing it took effect on October 11, 2019 . . . [and] the amendment does not have retroactive effect."  *McHenry v. Fox News Network, LLC*, 510 F. Supp. 3d 51, 68 (S.D.N.Y. 2020).  Accordingly, allegedly retaliatory actions that occurred before August 12, 2019, will be analyzed under the pre-amendment standard, applying Title VII requirements.

Title VII prohibits an employer from "fail[ing] or refus[ing] to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Similarly, the NYSHRL provides that "[i]t shall be an unlawful discriminatory practice [f]or an employer," on account of an individual's race, color, religion, sex or national origin, "to discriminate against such individual in compensation or in terms, conditions or privileges of employment."  N.Y. Exec. Law § 296(1)(a).  "Moreover, '[h]ostile work environment and retaliation claims under the NYSHRL are generally governed by the same standards as federal claims under Title VII.'"  *Antoine v. Brooklyn Maids 26, Inc.*, 489 F. Supp. 3d 68, 82-83 (E.D.N.Y. 2020) (quoting *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 609 (2d Cir. 2006)).  The Court will consider Plaintiff's Title VII and pre-2019 NYSHRL claims in tandem.  *See Smith v. Xerox Corp.*, 196 F.3d 358, 372 n.1 (2d Cir. 1999) ("[S]ince claims under the NYSHRL are analyzed identically to claims under . . . Title VII, the outcome of an employment discrimination claim made pursuant to the NYSHRL is the same as it is under . . . Title VII") (citation omitted).

Section 1981 provides for equal rights based upon race and covers both public and private conduct.  42 U.S.C. § 1981(a), (c).  Section 1981 provides, in pertinent part, as follows:

> All persons . . . shall have the same right . . . to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to the like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a).  To state a claim under § 1981, a plaintiff must allege: "(1) [that] the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race by the

defendant; and (3) the discrimination concerned one or more of the activities enumerated in the statute (i.e., make and enforce contracts, sue and be sued, give evidence, etc.) . . . ."  *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1087 (2d Cir. 1993) (brackets omitted). "The complaint must contain more than conclusory assertions."  *Seals v. Marianetti-DesRosiers*, No. 5:21-CV-988, 2022 WL 3153942, *7 (N.D.N.Y. Aug. 8, 2022).  "To 'survive a motion to dismiss, the plaintiff must specifically allege the events claimed to constitute intentional discrimination as well as circumstances giving rise to a plausible inference of racially discriminatory intent.'"  *Id.* (quoting *Yusuf v. Vassar Coll.*, 35 F.3d 709, 713 (2d Cir. 1994)) (other citation omitted).

A plaintiff can establish an inference of discrimination by "showing that the employer subjected him to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected group."  *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) (citations omitted).  "To be similarly situated, Plaintiffs must show that they were similarly situated 'in all material respects' to the individuals with whom they seek to compare themselves."  *Glenwright v. Xerox Corp.*, 832 F. Supp. 2d 268, 274 (W.D.N.Y. 2011) (quoting *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997)).

In *Swierkiewicz v. Sorema N.A.*, the Supreme Court held that "an employment discrimination plaintiff need not plead a *prima facie* case of discrimination" at the motion to dismiss stage.  *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 515 (2002).  "The Court ruled that the *'prima facie case'* requirement[ ] applied only at the summary judgment phase because it 'is an evidentiary standard, not a pleading requirement.'"  *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 83 (2d Cir. 2015) (citing *Swierkiewicz*, 534 U.S. at 510).  Under this standard, a plaintiff must "allege that the employer took adverse action against h[im] at least in part for a

discriminatory reason," *id.* at 87 (citing *Littlejohn v. City of New York*, 795 F.3d 297, 310 (2d Cir. 2015)), and "indicate the possibility of discrimination and thus present a plausible claim for disparate treatment." *Boykin v. KeyCorp*, 521 F.3d 202, 215-16 (2d Cir. 2008). A plausible Title VII discrimination claim requires a plaintiff to allege that "the plaintiff (1) is a member of a protected class, (2) was qualified, (3) suffered an adverse employment action, and (4) has at least minimal support for the proposition that the employer was motivated by discriminatory intent.'" *Buon v. Spindler*, 65 F.4th 64, 79 (2d Cir. 2023) (quoting *Littlejohn*, 795 F.3d at 311) (brackets omitted).

Claims of discrimination under Title VII, the pre-amendment NYSHRL, and § 1981 are analyzed under the same framework. *See Concey v. N.Y.S. Unified Court Sys.*, No. 08-CV-8858, 2011 WL 4549386, *14 (S.D.N.Y. Sept. 30, 2011) ("Standards for Title VII claims are evaluated under the same standard as NYSHRL claims and as discrimination claims under Section[ ] 1981 . . .") (internal footnotes omitted); *Zheng-Smith v. Nassau Health Care Corp.*, 486 F. Supp. 3d 611, 620-21 (E.D.N.Y. 2020) ("Claims for race and national origin discrimination under Title VII, [the] NYSHRL, and . . . § 1981 are all analyzed using the burden-shifting framework established by the Supreme Court in *McDonnell Douglas*").

### 2. Disparate Treatment

Plaintiff claims he was "subjected to disparate treatment giving rise to an inference of discrimination based on his protected classes in the form of threats, harassment, intimidation, discipline, and impediments to career progression taken and/or caused by Defendant[.]" Dkt. No. 1 at ¶ 103; *see also id.* at ¶ 105. Plaintiff claims that "the white faculty members of the FFS Department were treated more favorabl[y] than" he was, as the only non-white faculty member. Dkt. No. 20 at 19. Specifically, Plaintiff alleges that he was denied an extension for his April

2020 complaint, whereas his white colleague was given an extension for her complaint filed against him in May 2019, more time to respond to investigative questions, and access to all documents Plaintiff had provided during his complaint against her, *see* Dkt. No. 1 at ¶ 94; that he was relocated and had supervisory duties revoked because of an internal complaint against him, whereas his white colleague was not disciplined after Plaintiff filed a complaint against her, *see id.* at ¶ 85; and that he was excluded from faculty meetings at colleagues' homes whereas his white colleagues were not. *See id.* at ¶ 73.

Defendant does not dispute that Plaintiff is a Black man whose country of origin is the Democratic Republic of the Congo, and therefore a member of a protected class. *See* Dkt. No. 1 at ¶ 102.

Second, Plaintiff's allegation that he was "eligible" to hold the position of Department Chair satisfies the relatively minimal burden required to establish this second element. *See, e.g., Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 92 (2d Cir. 2001) ("[A]ll that is required is that the plaintiff establish basic eligibility for the position at issue, and not the greater showing that he satisfies the employer"). Defendant does not contend that Plaintiff was not qualified for any of the positions he held. *See generally* Dkt. Nos. 11, 21.

### 3. *Adverse Employment Action*

Defendant argues that "Plaintiff alleges no facts showing that the [Defendant] subjected him to an adverse employment action[.]" Dkt. No. 11-4 at 8; Dkt. No. 21 at 5-8.

"We define an adverse employment action as a 'materially adverse change' in the terms and conditions of employment." *Sanders v. N.Y.C Hum. Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004) (internal citation omitted). "An adverse employment action is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities." *Terry v. Ashcroft*, 336 F.3d

128, 138 (2d Cir. 2003) (quotation marks and citations omitted).  "Any decision by an employer, including the denial of a workplace opportunity that materially affects the terms and conditions of employment, can constitute an adverse employment action."  *Buon v. Spindler*, 65 F.4th 64, 80 (2d Cir. 2023) (citing *Cones v. Shalala*, 199 F.3d 512, 521 (D.C. Cir. 2000)).

The Second Circuit has held that denying an educator's request to participate in additional programs, such as a summer-school position, can be a plausible adverse employment action.  *See Buon*, 65 F.4th at 79.  "Failing to promote" an employee may constitute "a significant change in employment status," that satisfies the tangibility requirements of an adverse employment action under Title VII.  *Id.* (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)) (other citations omitted); *see also Treglia v. Town of Manlius*, 313 F.3d 713, 720 (2d Cir. 2002) (holding that failure to promote for discriminatory reasons is "within the core activities encompassed by the term 'adverse actions'").

In response, Plaintiff argues that "if an 'employer knew about but failed to take action to abate retaliatory [and discriminatory] harassment inflicted by co-workers' this may demonstrate an adverse employment action."  Dkt. No. 20 at 15 (quoting *Richardson v. New York State Dept. of Corr. Serv.*, 180 F.3d 426, 446 (2d Cir. 1999)).  Because Defendant does not argue that it is not liable for the actions of its employees, the question is whether any of Defendant's employees' conduct rose to the level of an adverse employment action.  *See LeeHim v. N.Y.C. Dep't of Educ.*, No. 17-CV-3838, 2017 WL 5634128, *4 (S.D.N.Y. Nov. 21, 2017) (explaining that "'petty slights,' such as "shushing" and "rude and intemperate conduct" do not amount to adverse employment actions).

Plaintiff brings timely claims that Defendant discriminated against him when Defendant: (1) "fail[ed] to address his complaints of discrimination", but only as to his 2020 complaint; and

(2) revoked his supervisory authority and relocated his office away from his department

colleagues' offices in response to a complaint a colleague filed.  Dkt. No. 20 at 16.

Plaintiff alleged that Defendant engaged in an adverse action when it gave Plaintiff less

time and access to information for the complaint he filed than it gave his similarly situated white

colleague for her complaint.  *See Shukla v. Deloitte Consulting LLP*, No. 19-CV-10578, 2021 WL

1131507 (S.D.N.Y. Mar. 24, 2021) ("It is only where a plaintiff is given a workload heavier that

similarly situated employees where such a workload may constitute an adverse employment

action").  However, Plaintiff did not allege that denying his request for an extension was more

than an inconvenience to him.  *See Terry*, 336 F.3d at 138.  Neither did Plaintiff plead that

denying him access to more information in the complaint filed against him was harmful.  *See*

*Mandala v. NTT Data, Inc.*, 975 F.3d 202, 209 (2d Cir. 2020) (holding that a plaintiff "must at

least set forth enough factual allegations to plausibly support each of the three basic elements of a

disparate impact claim"); *Kunik v. N.Y.C. Dep't of Educ.*, 436 F. Supp. 3d 684, 696 (S.D.N.Y.

2020) (holding that providing the plaintiff a shorter extension than requested to complete an

assignment was not an adverse employment action); *Pineda v. ESPN, Inc.*, No. 3:18-CV-325,

2018 WL 5268123, *4 (D. Conn. Oct. 10, 2018) (holding that the failure to provide the plaintiff

an extension of time did not constitute an adverse employment action).

Plaintiff argues that "demotions" and "reprimands" are adverse actions.  Dkt. No. 20 at 16

(quoting *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999)).  Plaintiff also relies on *Preda*, as

support that excluding an employee from meetings and downgrading responsibilities is an adverse

employment action.  *Id.* (citing *Preda v. Nissho Iwai American Corp.*, 128 F.3d 789 (2d Cir.

1997)).  Defendant argues that Plaintiff was promoted to full Professor and served as Department

Chair, and therefore *Preda* is inapplicable.  *See* Dkt. No. 21 at 8.  Plaintiff need not have been

fired to make out his claim.  However, the complaint does not allege that the office Plaintiff was moved to is inferior to his prior office, a downgrade, or anything more than inconvenient.  Unlike the plaintiff in *Preda*, Plaintiff did not allege that removing his supervisory duties was a demotion, meaningfully reduced his job responsibilities, or impacted his opportunities for advancement.  *See Preda*, 128 F.3d at 789 (remanding the denial of summary judgment where the plaintiff had alleged "that his job duties and responsibilities were downgraded . . . and his position was reduced to largely clerical tasks); *see also Galabya v. New York City Board of Education*, 202 F.3d 636, 641 (2d Cir. 2000) (holding that the teacher-plaintiff had not shown that his new class assignment was materially less prestigious or less suited to his skills as to constitute an adverse employment action).

Plaintiff's subjective dislike of his new office location and the revocation of his supervisory responsibilities over a coworker who had filed a harassment claim against him do not constitute adverse employment actions.  *See e.g.*, *Abalola v. St. Luke's-Roosevelt Hosp. Ctr.*, No. 20-CV-6199, 2022 WL 973861, *7 (S.D.N.Y. Mar. 30, 2022) ("[The plaintiff's] claims that [two individuals] harassed and demeaned her do not constitute adverse employment actions").  Plaintiff has not alleged that the changes were more than "a mere inconvenience or an alteration of job responsibilities," *Terry*, 336 F.3d at 138 (internal quotation marks and citations omitted), nor has he alleged that his claims are based on more than "subjective, personal disappointments[.]" *Williams*, 368 F.3d at 128.[13]

### 4. *Disparate Impact*

---

[13] The Court need not reach the issue of discriminatory intent because Plaintiff has failed to allege any timely adverse actions.

Title VII and the NYSHRL "prohibit 'not only overt discrimination but also practices that are fair in form, but discriminatory in operation' – that is, practices that have a 'disparate impact.'" *Mandala v. NTT Data, Inc.*, 975 F.3d 202, 207 (2d Cir. 2020) (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971)).

Under Title VII and the NYSHRL, to make a *prima facie* showing of disparate impact, a plaintiff must "(1) identify a specific employment practice or policy; (2) demonstrate that a disparity exists; and (3) establish a causal relationship between the two." *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 151 (2d Cir. 2012) (quotation marks and citations omitted).  "Unlike a disparate treatment claim, however, a disparate impact claim does not require the plaintiff to show that the defendant *intended* to discriminate against a particular group." *Mandala*, 975 F.3d at 207 (citing *Ricci*, 557 U.S. at 577-78) (other citations omitted).  To survive a motion to dismiss, a plaintiff "need not plead a *prima facie* case," but "must at least set forth enough factual allegations to plausibly support each of the three basic elements of a disparate impact claim." *Id.* (other citation omitted); *see also Malone v. N.Y. Pressman's Union No. 2*, No. 07-CV-9583, 2011 WL 2150551, *7 (S.D.N.Y. May 31, 2011).

Plaintiff claims that he "has been disparately impacted by Defendant's internal policies, practices, and procedures, which have been discriminatory in operation."  Dkt. No. 1 at ¶ 105. Plaintiff's only timely allegations related to his disparate impact claim are Defendant's handling of Professor Mouflard's 2019 complaint, which continued through March 20, 2020, and Plaintiff's 2020 complaint.  However, Plaintiff has failed to set forth enough factual allegations to plausibly support the claim that his office relocation, revoked supervisory authority, or his denied extension request, were causally related to any specific employment policy or practice of handling complaints.  Therefore, Plaintiff's disparate impact claims are dismissed.

### 5. *Plaintiff's Hostile Work Environment Claims*

Title VII's prohibition against employment discrimination because of race, color, religion, sex, or national origin encompasses "requiring people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993). A hostile work environment includes "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* (internal quotation marks omitted). "'The environment need not be unendurable or intolerable' to be a hostile work environment." *Rodriguez v. Town of Ramapo*, No. 18-CV-1878, 2019 WL 4688609, *22 (S.D.N.Y. Sept. 26, 2019) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003)).

To establish a hostile work environment claim under Title VII, § 1981, or the NYSHRL,[14] "a plaintiff must plead facts that would tend to show that the complained of conduct: (1) 'is objectively severe or pervasive, that is, . . . the conduct creates an environment that a reasonable person would find hostile or abusive'; (2) creates an environment 'that the plaintiff subjectively perceives as hostile or abusive'; and (3) 'creates such an environment because of the plaintiff's [race].'" *Patane*, 508 F.3d at 113 (quoting *Gregory v. Daly*, 243 F.3d 687, 691-92 (2d Cir. 2001)); *see also Sosa v. New York City Dep't of Educ.*, 368 F. Supp. 3d 489, 521 (E.D.N.Y. 2019) (applying the same standard to hostile work environment claims under § 1981 as under Title VII).[15]

---

[14] Prior to the August 2019 amendment.

[15] In addition to establishing a hostile work environment, a plaintiff must also establish "that a specific basis exists for imputing the objectionable conduct to the employer." *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002) (internal quotation marks and citations omitted); *see also Kotcher v. Rosa and Sullivan Appliance Ctr., Inc.*, 957 F.2d 59, 63 (2d Cir. 1992). "In a situation such as this, 'when the harassment is attributable to a coworker, rather than a supervisor, . . . the employer will be held liable only for its own negligence.'" *Russell v. N.Y. Univ.*, 739 Fed. Appx.

To establish that a work environment is objectively hostile, "a plaintiff need not show that [his] hostile working environment was both severe *and* pervasive; only that it was sufficiently severe *or* sufficiently pervasive, or a sufficient combination of these elements, to have altered her working conditions." *Pucino v. Verizon Wireless Commc'ns*, 618 F.3d 112, 119 (2d Cir. 2010) (citations omitted). To be considered pervasive, a plaintiff must show "that the incidents were 'sufficiently continuous and concerted.'" *Brennan v. Metro. Opera Assoc.*, 192 F.3d 310, 318 (2d Cir. 1999) (quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997)); *see also Robinson v. Purcell Const. Corp.*, 859 F. Supp. 2d 245, 255 (N.D.N.Y. 2012) (finding that five "crude and offensive" gender-based comments were "neither pervasive nor severe"). As for severity, the "ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing" are not objectively severe enough to establish a hostile work environment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 778 (1998).

"Courts evaluate whether an environment is 'hostile' or 'abusive' by examining the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Fitchett*, 2019 WL 3430726, at *11 (quoting *Forklift Sys.*, 510 U.S. at 21).

> While Plaintiffs face a "high hurdle with respect to the level and frequency of offensive conduct that must be present" to prove their hostile work environment claims, *DelaPaz v. N.Y.C. Police Dep't,* No. 01-CV-5416, 2003 WL 21878780, *3 (S.D.N.Y. Aug. 8, 2003) "to avoid dismissal under [FED.R.CIV.P.] 12(b) (6), a plaintiff need only plead facts sufficient to support the conclusion that []he was faced with 'harassment . . . of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse,'" *Patane*, 508 F.3d at 113 (quoting *Terry v.*

---

28, 30 (2d Cir. 2018) (quoting *Duch v. Jakubek*, 588 F.3d 757, 762 (2d Cir. 2009)). Defendant does not contest that it is liable for the actions of its employees.

> *Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003)).  The Second Circuit
> has "repeatedly cautioned against setting the bar too high" in this
> context.  *Patane*, 508 F.3d at 113 (quotation marks omitted).

*Ruiz v. City of New York*, No. 14-CV-5231, 2015 WL 5146629, *8 (S.D.N.Y. Sept. 2, 2015).

In the present matter, the Court finds that Plaintiff has failed to plausibly allege that Defendant's conduct was sufficiently severe to create an environment that a reasonable person would find hostile or that the environment was created because of a characteristic protected by Title VII or the NYSHRL.  In his complaint, Plaintiff uses the term "hostile work environment" and notes that faculty outside of the FFS Department support his belief, but he has failed to allege sufficient facts to support his allegation.  As Defendant notes, the closest Plaintiff comes is when he alleges as follows:

> From 1997 to the present, Professor Guyot-Bender has taunted
> Plaintiff with attempts to engage in confrontations ("Let's fight");
> made racially stereotypical remarks; invaded his and his family's
> privacy by showing-up unsolicited to Plaintiff's residence; spread
> rumors about Plaintiff's son and his disability; and threatened to
> "isolate" Plaintiff.

Dkt. No. 1 at ¶ 91.  Plaintiff claims that Professor Guyot-Bender made "racially stereotypical remarks," but he does not specify the content of these remarks, their frequency, or when "[f]rom 1997 to the present" such remarks were made.  In fact, Plaintiff does not specify any racially-based remarks at all by any member of Defendant's community.

In his opposition, Plaintiff relies heavily on Defendant's disposition of Professor Mouflard's complaint against him.  However, this was not a complaint initiated by his supervisor; rather, it was a complaint made by an untenured female faculty member far junior to Plaintiff. Moreover, the disposition did not result in a "severe sanction" as argued by Plaintiff.  Contrary to the allegations in his response, Plaintiff's supervisory responsibilities were not affected by Dean

Keen's decision in March 2020; by his own admission, Plaintiff had already decided to step down as FFS Department Chair in June 2019.  Dean Keen's determination made no reference to any supervisory responsibilities because he had already voluntarily relinquished them.  Dean Keen's decision only directed that Plaintiff have no role in evaluating Professor Mouflard, who was then approaching the time for tenure review.  *See* Dkt. No. 11-3 at 7.  Likewise, Dean Keen's relocation of Plaintiff's office hardly shows that Defendant created a hostile work environment, especially considering that Plaintiff has not alleged that his new office is somehow substandard.

Additionally, the fact that the Dean of the Faculty engaged outside attorneys to investigate a complaint of gender-based harassment by a junior female member of the faculty, and then wrote a measured decision after the completion of that investigation, hardly constitutes facts showing a racially-based hostile work environment.  Plaintiff's repeated complaint that Professor Mouflard's complaint was handled differently than his complaint against Professor Guyot-Bender cannot save his allegation of a hostile work environment because, as Plaintiff acknowledges, he chose to withdraw his complaint before the investigation could be completed.  *See* Dkt. No. 1 at ¶ 97.

It is apparent from the complaint that Plaintiff and his colleagues in the FFS Department do not get along.  As stated above, however, the anti-discrimination laws do not set forth a general civility code for the American workplace, and do not prohibit employers from maintaining nasty, unpleasant workplaces.  Plaintiff's conclusory allegations spanning more than twenty-five years fall far short of plausibly alleging misconduct that is severe or pervasive enough to create an objectively hostile work environment.  Moreover, Plaintiff's sparse allegations relating to his race and national origin fail to plausibly demonstrate that any of the perceived hostility occurred because of his protected status.

36

Accordingly, the Court grants Defendant's motion to dismiss as to Plaintiff's hostile work environment claim.

**D.     Retaliation Claims under Title VII and NYSHRL**

*1. Legal Standards*

Title VII provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).

"To establish a *prima facie* case of retaliation, the plaintiff must show that: '(1) he was engaged in an activity protected under Title VII; (2) his employer was aware of his participation in the protected activity; (3) the employer took adverse action against him; and (4) a causal connection existed between the protected activity and the adverse action.'" *Kirkland-Hudson v. Mount Vernon City Sch. Dist.*, 665 F. Supp. 3d 412, 459 (S.D.N.Y. 2023) (quoting *Zann Kwan*, 737 F.3d at 850); *Buchanan v. City of New York*, 556 F. Supp. 3d 346, 365 (S.D.N.Y. 2021) (NYSHRL).  For a retaliation claim to survive a motion to dismiss, a "plaintiff must plausibly allege that: (1) defendants discriminated—or took an adverse employment action—against him, (2) 'because' he has opposed any unlawful employment practice." *Vega*, 801 F.3d at 89-90 (quoting 42 U.S.C. § 2000e-3(a)).

Retaliation claims under Title VII and the NYSHRL are generally subject to the same standard.  *See Kirkland-Hudson*, 665 F. Supp. 3d at 459; *see also Goonewardena v. N.Y. Workers Comp. Bd.*, 258 F. Supp. 3d 326, 343-44 (S.D.N.Y. 2017) (treating retaliation claims under Title VII, § 1983, and the NYSHRL under the same standard).  The Court therefore evaluates the

substance of Plaintiff's retaliation claims before August 12, 2019, congruently under Title VII and the NYSHRL, and applies the NYCHRL standard to events that occurred after August 12, 2019. *See Wellner v. Montefiore Med. Ctr.*, No. 17-CV-3479, 2019 WL 4081898, *5 n.4 (S.D.N.Y. Aug. 29, 2019) ("The effect of [the 2019 NYSHRL amendments] is to render the standard for claims closer to the standard under the NYCHRL . . . however, these amendments only apply to claims that accrue on or after the effective date of October 11, 2019"). "The elements of retaliation under the NYCHRL differ [from the pre-amendment NYSHRL] only in that the plaintiff need not prove any adverse employment action; instead, he must prove that something happened that would be reasonably likely to deter a person from engaging in protected activity." *Gutierrez v. City of N.Y.*, 756 F. Supp. 2d 491, 509 n.12 (S.D.N.Y. 2010).

Post-Amendment NYSHRL claims apply the NYCHRL standard. *See Arazi v. Cohen Bros. Realty Corp.*, No. 1:20-CV-8837, 2022 WL 912940, *16 (S.D.N.Y. Mar. 28, 2022) ("After [the 2019] amendment, the standard for [the] NYSHRL [retaliation provisions] aligns with the NYCHRL standard"). "The elements of retaliation under the NYCHRL differ [from the pre-amendment NYSHRL] only in 'that the plaintiff need not prove any 'adverse' employment action; instead, he must prove that something happened 'that would be reasonably likely to deter a person from engaging in protected activity.'" *Gutierrez v. City of N.Y.*, 756 F. Supp. 2d 491, 509 n.12 (S.D.N.Y. 2010) (quoting *Jimenez v. City of New York*, 605 F. Supp. 2d 485, 528 (S.D.N.Y.2009) (quoting NYCHRL § 8–107(7)).

To state a retaliation claim under either Title VII or the NYSHRL,[16] "a plaintiff also must show "'that there was a causal connection between the protected activity and the employer's subsequent action.'" *Kraiem v. JonesTrading Institutional Servs. LLC*, 571 F. Supp. 3d 53, 60

---

[16] Applying the NYCHRL standard.

(S.D.N.Y. 2021) (quoting *Adams v. Equinox Holdings, Inc.*, No. 19-CV-08461, 2020 WL 5768921, *6 (S.D.N.Y. Sept. 28, 2020)) (other citations omitted).

For a Title VII retaliation claim, "the standard for adverse employment action [is] a materially adverse change in the terms, privileges, duration and conditions of employment." *Treglia*, 313 F.3d 713, 720 (2d Cir. 2002).  "The Supreme Court [] held that in the context of a Title VII retaliation claim, an adverse employment action is any action that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination.'"  *Vega*, 801 F.3d at 90 (quoting *Burlington*, 548 U.S. at 57); *see also Hicks v. Baines*, 593 F.3d 159, 162 (2d Cir. 2010).

As the Second Circuit described in *Hicks v. Baines*, the Supreme Court recognizes that "Title VII's anti-discrimination and anti-retaliation provisions 'are not coterminous'; anti-retaliation protection is broader and 'extends beyond workplace-related or employment-related retaliatory acts and harm.'"  *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006)).  Although Title VII "does not set forth a general civility code for the American workplace," *Hicks*, 593 F.3d at 165 (quoting *White*, 548 U.S. at 68-69), "the alleged acts of retaliation need to be considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable." *Id.* (quoting *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 227 (2d Cir. 2006)).

### 2. Application

In the present matter, the Court finds that Defendant's motion must be granted because Plaintiff has failed to set forth any adverse employment action that is causally related to protected activity or conduct that would be reasonably likely to deter a person from engaging in protected activity.  As Defendant notes, in his complaint Plaintiff alleges that he "complained about the discrimination he was experiencing on multiple occasions," but he fails to allege the date of any

of the alleged complaints.  *See* Dkt. No. 1 at ¶ 112.  Earlier in his complaint, Plaintiff alleges that

he complained to then Dean Urgo in 2009 about Professor Guyot-Bender, *see id.* at ¶ 76, that he

complained in 2014 about the delay in his promotion to full Professor (which had occurred two

years earlier), *see id.* at ¶ 77, and that he complained in 2016 about Professor Krueger's support of

Professor Morgan for promotion to full Professor.  *See id.* at ¶ 79.  Each of these alleged protected

activities occurred years prior to any potential timely adverse employment action.  *See Myers v.

Doherty*, No. 21-cv-219, 2021 WL 5599502, *12 (S.D.N.Y. Nov. 30, 2021) (holding that a

several-year gap between the alleged protected activity and the one timely adverse employment

action is insufficient to plausibly allege a causal relationship); *see also Raymond v. City of New

York*, 317 F. Supp. 3d 746, 769 (S.D.N.Y. 2018) (holding that a gap of more than ten months

between the protected activity and the adverse employment action does "not allow for an

inference of causation").

The only timely potential adverse employment action is Defendant's March 20, 2020,

decision to relocate Plaintiff's office and removing his supervisory duties over Professor

Mouflard.  However, Plaintiff has fail to allege that he engaged in any protected activity in the

weeks or months prior to this alleged adverse employment action.  Rather, the only protected

activity that Plaintiff engaged in around this time is when he filed a complaint against Professor

Guyot-Bender in or around April 2020.  *See* Dkt. No. 1 at ¶ 93.  It necessarily follows that the

alleged adverse employment actions that occurred in March of 2020 cannot be causally related to

Plaintiff's protected activity in April of 2020.

Finally, the Court finds that even assuming that Plaintiff plausibly alleged a causal

connection, he has failed to set forth a sufficient adverse employment action.  Dean Keen's

decision to prevent Plaintiff from any evaluation of Professor Mouflard as she was approaching

tenure review and moving his office to a different location is insufficient to satisfy the adverse

employment action requirement. *See Klein v. N.Y. Univ.*, 786 F. Supp. 2d 830, 849 (S.D.N.Y.

2011) (holding that the plaintiff's assignment to an undesirable office location was insufficient to

establish an adverse employment action necessary to support a retaliation claim).

### 3. NYSHRL Claims

Plaintiff claims that he was denied an extension for the complaint he filed in April 2020,

whereas his white colleague was granted an extension for her 2019 complaint against him. *See*

Dkt. No. 1 at ¶ 80.  Plaintiff also claims that his white female colleague was given more access to

information for the complaint he filed against her in April 2020 than he had been given when a

different white female colleague filed a complaint against him in 2019. *See id.*  Even under the

less demanding NYSHRL standard, Plaintiff has not stated how either the denied extension or the

access to information negatively affected him or deterred him from filing complaints. *See Taylor*

*v. City of New York*, 207 F. Supp. 3d 293, 308 (S.D.N.Y. 2016) ("Although 'New York courts

have broadly interpreted the NYCHRL's retaliation provisions,' *Mihalik*, 715 F.3d at 112, a

plaintiff must still plead some facts that h[is] employers' actions disadvantaged [him]").

Plaintiff has not made more than mere conclusory allegations that Defendant's March 20,

2020, decision to relocate Plaintiff's office and revoke his "evaluator/supervisory duties" over the

person who brought the complaint against him was "arbitrary," and not rationally related to

Defendant's legitimate goal of protecting Professor Mouflard from the intimidation and

harassment she alleged in her complaint against Plaintiff.

Neither has Plaintiff alleged that Defendant's decision was causally connected to any

protected activity he engaged in.  Defendant argues Plaintiff has failed to allege "any facts that

show that Dean Keen's decision on Professor Mouflard's internal harassment complaint was

causally related to any protected activity by Plaintiff." Dkt. No. 11-4 at 19.  In response, Plaintiff argues that the "timing itself is more than sufficient at this stage" to allege a causal connection between filing his "complaint against Professor Guyot-Bender in March 2020, and the report by Dean Keen, and the resulting discipline [that] occurred in April 2020." Dkt. No. 20 at 23.  In response, Defendant points out that Plaintiff alleges that he filed his complaint against Professor Guyot-Bender "[i]n or around April 2020," Dkt. No. 1 at ¶ 93, and Dean Keen imposed remedial measures against Plaintiff when the Dean ruled on Professor Mouflard's complaint against Plaintiff "[o]n or about March 20, 2020[.]"  *Id.* at ¶ 85; *see also* Dkt. No. 21 at 9.  The order of events belies a claim that temporal proximity establishes causation between Plaintiff's protected activity and Dean Keen's decision.

Therefore, Plaintiff's claims that Defendant retaliated against him are dismissed.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions, and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendant's motion to dismiss (Dkt. No. 11) is **GRANTED**; and the Court further

**ORDERS** that Plaintiff's complaint is **DISMISSED with prejudice**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendant's favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: March 20, 2024
      Albany, New York

Mae A. D'Agostino
U.S. District Judge